# POE ET AL. v. ULLMAN, STATE'S ATTORNEY.

No. 60. Argued March 1–2, 1961.—Decided June 19, 1961.*

*Fowler V. Harper* argued the cause and filed a brief for appellants.

*Raymond J. Cannon,* Assistant Attorney General of Connecticut, argued the cause for appellee. With him on the brief was *Albert L. Coles,* Attorney General.

*Harriet Pilpel* argued the cause for the Planned Parenthood Federation of America, Inc., as *amicus curiae,* urging

---

*Together with No. 61, *Buxton* v. *Ullman, State's Attorney,* also on appeal from the same Court.

reversal. With her on the brief were *Morris L. Ernst* and *Nancy F. Wechsler.*

Briefs of *amici curiae,* urging reversal, were filed by *Whitney North Seymour* for Dr. Willard Allen et al., and by *Osmond K. Fraenkel* and *Rowland Watts* for the American Civil Liberties Union et al.

MR. JUSTICE FRANKFURTER announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE CLARK and MR. JUSTICE WHITTAKER join.

These appeals challenge the constitutionality, under the Fourteenth Amendment, of Connecticut statutes which, as authoritatively construed by the Connecticut Supreme Court of Errors, prohibit the use of contraceptive devices and the giving of medical advice in the use of such devices. In proceedings seeking declarations of law, not on review of convictions for violation of the statutes, that court has ruled that these statutes would be applicable in the case of married couples and even under claim that conception would constitute a serious threat to the health or life of the female spouse.

No. 60 combines two actions brought in a Connecticut Superior Court for declaratory relief. The complaint in the first alleges that the plaintiffs, Paul and Pauline Poe,[1] are a husband and wife, thirty and twenty-six years old respectively, who live together and have no children. Mrs. Poe has had three consecutive pregnancies terminating in infants with multiple congenital abnormalities from which each died shortly after birth. Plaintiffs have consulted Dr. Buxton, an obstetrician and gynecologist of eminence, and it is Dr. Buxton's opinion that the cause of the infants' abnormalities is genetic, although the

---

[1] Plaintiffs in the two cases composing No. 60 sue under fictitious names. The Supreme Court of Errors of Connecticut approved this procedure in the special circumstances of the cases.

underlying "mechanism" is unclear. In view of the great emotional stress already suffered by plaintiffs, the probable consequence of another pregnancy is psychological strain extremely disturbing to the physical and mental health of both husband and wife. Plaintiffs know that it is Dr. Buxton's opinion that the best and safest medical treatment which could be prescribed for their situation is advice in methods of preventing conception. Dr. Buxton knows of drugs, medicinal articles and instruments which can be safely used to effect contraception. Medically, the use of these devices is indicated as the best and safest preventive measure necessary for the protection of plaintiffs' health. Plaintiffs, however, have been unable to obtain this information for the sole reason that its delivery and use may or will be claimed by the defendant State's Attorney (appellee in this Court) to constitute offenses against Connecticut law. The State's Attorney intends to prosecute offenses against the State's laws, and claims that the giving of contraceptive advice and the use of contraceptive devices would be offenses forbidden by Conn. Gen. Stat. Rev., 1958, §§ 53–32 and 54–196.[2]

---

[2] As a matter of specific legislation, Connecticut outlaws only the use of contraceptive materials. Conn. Gen. Stat. Rev., 1958, § 53–32 provides:

*"Use of drugs or instruments to prevent conception.* Any person who uses any drug, medicinal article or instrument for the purpose of preventing conception shall be fined not less than fifty dollars or imprisoned not less than sixty days nor more than one year or be both fined and imprisoned."

There are no substantive provisions dealing with the sale or distribution of such devices, nor with the giving of information concerning their use. These activities are deemed to be involved in law solely because of the general criminal accessory enactment of Connecticut. This is Conn. Gen. Stat. Rev., 1958, § 54–196:

*"Accessories.* Any person who assists, abets, counsels, causes, hires or commands another to commit any offense may be prosecuted and punished as if he were the principal offender."

Alleging irreparable injury and a substantial uncertainty of legal relations (a local procedural requisite for a declaration), plaintiffs ask a declaratory judgment that §§ 53–32 and 54–196 are unconstitutional, in that they deprive the plaintiffs of life and liberty without due process of law.

The second action in No. 60 is brought by Jane Doe, a twenty-five-year-old housewife. Mrs. Doe, it is alleged, lives with her husband, they have no children; Mrs. Doe recently underwent a pregnancy which induced in her a critical physical illness—two weeks' unconsciousness and a total of nine weeks' acute sickness which left her with partial paralysis, marked impairment of speech, and emotional instability. Another pregnancy would be exceedingly perilous to her life. She, too, has consulted Dr. Buxton, who believes that the best and safest treatment for her is contraceptive advice. The remaining allegations of Mrs. Doe's complaint, and the relief sought, are similar to those in the case of Mr. and Mrs. Poe.

In No. 61, also a declaratory judgment action, Dr. Buxton is the plaintiff. Setting forth facts identical to those alleged by Jane Doe, he asks that the Connecticut statutes prohibiting his giving of contraceptive advice to Mrs. Doe be adjudged unconstitutional, as depriving him of liberty and property without due process.

In all three actions, demurrers were advanced, *inter alia,* on the ground that the statutes attacked had been previously construed and sustained by the Supreme Court of Errors of Connecticut, and thus there did not exist the uncertainty of legal relations requisite to maintain suits for declaratory judgment. While the Connecticut Supreme Court of Errors in sustaining the demurrers referred to this local procedural ground, relying on *State* v. *Nelson,* 126 Conn. 412, 11 A. 2d 856, and *Tileston* v. *Ullman,* 129 Conn. 84, 26 A. 2d 582, app. dism'd, 318 U. S. 44, we cannot say that its decision rested on it. 147 Conn.

48, 156 A. 2d 508. We noted probable jurisdiction. 362 U. S. 987.

Appellants' complaints in these declaratory judgment proceedings do not clearly, and certainly do not in terms, allege that appellee Ullman threatens to prosecute them for use of, or for giving advice concerning, contraceptive devices. The allegations are merely that, in the course of his public duty, he intends to prosecute any offenses against Connecticut law, and that he claims that use of and advice concerning contraceptives would constitute offenses. The lack of immediacy of the threat described by these allegations might alone raise serious questions of non-justiciability of appellants' claims. See *United Public Workers* v. *Mitchell*, 330 U. S. 75, 88. But even were we to read the allegations to convey a clear threat of imminent prosecutions, we are not bound to accept as true all that is alleged on the face of the complaint and admitted, technically, by demurrer, any more than the Court is bound by stipulation of the parties. *Swift & Co.* v. *Hocking Valley R. Co.*, 243 U. S. 281, 289. Formal agreement between parties that collides with plausibility is too fragile a foundation for indulging in constitutional adjudication.

The Connecticut law prohibiting the use of contraceptives has been on the State's books since 1879. Conn. Acts 1879, c. 78. During the more than three-quarters of a century since its enactment, a prosecution for its violation seems never to have been initiated, save in *State* v. *Nelson*, 126 Conn. 412, 11 A. 2d 856. The circumstances of that case, decided in 1940, only prove the abstract character of what is before us. There, a test case was brought to determine the constitutionality of the Act as applied against two doctors and a nurse who had allegedly disseminated contraceptive information. After the Supreme Court of Errors sustained the legislation on appeal from a demurrer to the information, the State

moved to dismiss the information. Neither counsel nor our own researches have discovered any other attempt to enforce the prohibition of distribution or use of contraceptive devices by criminal process.[3] The unreality of these law suits is illumined by another circumstance. We were advised by counsel for appellants that contraceptives are commonly and notoriously sold in Connecticut drug stores.[4] Yet no prosecutions are recorded; and certainly such ubiquitous, open, public sales would more quickly invite the attention of enforcement officials than the conduct in which the present appellants wish to engage— the giving of private medical advice by a doctor to his individual patients, and their private use of the devices prescribed. The undeviating policy of nullification by Connecticut of its anti-contraceptive laws throughout all the long years that they have been on the statute books bespeaks more than prosecutorial paralysis. What was said in another context is relevant here. "Deeply embedded traditional ways of carrying out state policy . . ."—or not carrying it out—"are often tougher and truer law than the dead words of the written text." *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362, 369.

The restriction of our jurisdiction to cases and controversies within the meaning of Article III of the Constitution, see *Muskrat* v. *United States,* 219 U. S. 346, is not the sole limitation on the exercise of our appellate powers, especially in cases raising constitutional ques-

---

[3] The assumption of prosecution of spouses for use of contraceptives is not only inherently bizarre, as was admitted by counsel, but is underscored in its implausibility by the disability of spouses, under Connecticut law, from being compelled to testify against one another.

[4] It is also worthy of note that the Supreme Court of Errors has held that contraceptive devices could not be seized and destroyed as nuisances under the State's seizure statutes. See *State* v. *Certain Contraceptive Materials,* 126 Conn. 428, 11 A. 2d 863, decided on the same day as the *Nelson* case.

tions. The policy reflected in numerous cases and over a long period was thus summarized in the oft-quoted statement of Mr. Justice Brandeis: "The Court [has] developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341, 346 (concurring opinion). In part the rules summarized in the *Ashwander* opinion have derived from the historically defined, limited nature and function of courts and from the recognition that, within the framework of our adversary system, the adjudicatory process is most securely founded when it is exercised under the impact of a lively conflict between antagonistic demands, actively pressed, which make resolution of the controverted issue a practical necessity. See *Little* v. *Bowers,* 134 U. S. 547, 558; *California* v. *San Pablo & Tulare R. Co.,* 149 U. S. 308, 314; *United States* v. *Fruehauf,* 365 U. S. 146, 157. In part they derive from the fundamental federal and tripartite character of our National Government and from the role—restricted by its very responsibility—of the federal courts, and particularly this Court, within that structure. See the Note to *Hayburn's Case,* 2 Dall. 409; *Massachusetts* v. *Mellon,* 262 U. S. 447; 488–489; *Watson* v. *Buck,* 313 U. S. 387, 400–403; *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 471.

These considerations press with special urgency in cases challenging legislative action or state judicial action as repugnant to the Constitution. "The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity." *Parker* v. *County of Los Angeles,* 338 U. S. 327, 333. See also *Liverpool, N. Y. & P. S. S. Co.* v. *Commissioners,* 113 U. S. 33, 39. The various doctrines of "stand-

ing," [5] "ripeness," [6] and "mootness," [7] which this Court has evolved with particular, though not exclusive, reference to such cases are but several manifestations—each having its own "varied application" [8]—of the primary conception that federal judicial power is to be exercised to strike down legislation, whether state or federal, only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action. *Stearns* v. *Wood,* 236 U. S. 75; *Texas* v. *Interstate Commerce Comm'n,* 258 U. S. 158; *United Public Workers* v. *Mitchell,* 330 U. S. 75, 89–90. "This court can have no right to pronounce an abstract opinion upon the constitutionality of a State law. Such law must be brought into actual, or threatened operation upon rights properly falling under judicial cognizance, or a remedy is not to be had here." *Georgia* v. *Stanton,* 6 Wall. 50, 75, approvingly quoting Mr. Justice Thompson, dissenting, in *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 75; also quoted in *New Jersey* v. *Sargent,* 269 U. S. 328, 331. "The party who invokes the power [to annul legislation on grounds

[5] See, *e. g., Braxton County Court* v. *West Virginia,* 208 U. S. 192; *Yazoo & Mississippi Valley R. Co.* v. *Jackson Vinegar Co.,* 226 U. S. 217; *Fairchild* v. *Hughes,* 258 U. S. 126; *Tileston* v. *Ullman,* 318 U. S. 44; *United States* v. *Raines,* 362 U. S. 17. Cf. *Owings* v. *Norwood's Lessee,* 5 Cranch 344.

[6] See, *e. g., New Jersey* v. *Sargent,* 269 U. S. 328; *Arizona* v. *California,* 283 U. S. 423; *International Longshoremen's Union* v. *Boyd,* 347 U. S. 222. Cf. *Coffman* v. *Breeze Corporations,* 323 U. S. 316.

[7] See, *e. g., San Mateo County* v. *Southern Pacific R. Co.,* 116 U. S. 138; *Singer Mfg. Co.* v. *Wright,* 141 U. S. 696; *Mills* v. *Green,* 159 U. S. 651; *Kimball* v. *Kimball,* 174 U. S. 158; *Tennessee* v. *Condon,* 189 U. S. 64; *American Book Co.* v. *Kansas,* 193 U. S. 49; *Jones* v. *Montague,* 194 U. S. 147; *Security Mutual Life Ins. Co.* v. *Prewitt,* 200 U. S. 446; *Richardson* v. *McChesney,* 218 U. S. 487; *Berry* v. *Davis,* 242 U. S. 468; *Atherton Mills* v. *Johnston,* 259 U. S. 13.

[8] Mr. Justice Brandeis, concurring, in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341, 347.

of its unconstitutionality] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement . . . ." *Massachusetts* v. *Mellon,* 262 U. S. 447, 488.[9]

This principle was given early application and has been recurringly enforced in the Court's refusal to entertain cases which disclosed a want of a truly adversary contest, of a collision of actively asserted and ·differing claims. See, *e. g., Cleveland* v. *Chamberlain,* 1 Black 419; *Wood-Paper Co.* v. *Heft,* 8 Wall. 333. Such cases may not be "collusive" in the derogatory sense of *Lord* v. *Veazie,* 8 How. 251—in the sense of merely colorable disputes got up to secure an advantageous ruling from the Court. See *South Spring Hill Gold Mining Co.* v. *Amador Medean Gold Mining Co.,* 145 U. S. 300, 301. The Court has found unfit for adjudication any cause that "is not in any real sense adversary," that "does not assume the 'honest and actual antagonistic assertion of rights' to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court." *United States* v. *Johnson,* 319 U. S. 302, 305. The requirement for adversity was classically expounded in *Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S. 339, 344–345:

> ". . . The theory upon which, apparently, this suit was brought is that parties have an appeal from the

[9] The *Mellon* cases involved what is technically designated as the problem of "standing," but the concern which they exemplify that constitutional issues be determined only at the suit of a person immediately injured has equal application here. It makes little sense to insist that only the parties themselves whom legislation immediately threatens may sue to strike it down and, at the same time, permit such suit when there is not even a remote likelihood that the threat to them will in fact materialize.

legislature to the courts; and that the latter are given an immediate and general supervision of the constitutionality of the acts of the former. Such is not true. Whenever, in pursuance of an honest and actual antagonistic assertion of rights by one individual against another, there is presented a question involving the validity of any act of any legislature, State or Federal, and the decision necessarily rests on the competency of the legislature to so enact, the court must, in the exercise of its solemn duties, determine whether the act be constitutional or not; but such an exercise of power is the ultimate and supreme function of courts. It is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act."

What was said in the *Wellman* case found ready application in proceedings brought under modern declaratory judgment procedures. For just as the declaratory judgment device does not "purport to alter the character of the controversies which are the subject of the judicial power under the Constitution," *United States* v. *West Virginia,* 295 U. S. 463, 475, it does not permit litigants to invoke the power of this Court to obtain constitutional rulings in advance of necessity. *Electric Bond & Share Co.* v. *Securities and Exchange Comm'n,* 303 U. S. 419, 443. The Court has been on the alert against use of the declaratory judgment device for avoiding the rigorous insistence on exigent adversity as a condition for evoking Court adjudication. This is as true of state court suits for declaratory judgments as of federal. By exercising their jurisdiction, state courts cannot determine the jurisdiction to be exercised by this Court. *Tyler*

v. *Judges of the Court of Registration,* 179 U. S. 405; *Doremus* v. *Board of Education,* 342 U. S. 429. Although we have held that a state declaratory-judgment suit may constitute a case or controversy within our appellate jurisdiction, it is to be reviewed here only "so long as the case retains the essentials of an adversary proceeding, involving a real, not a hypothetical, controversy, which is finally determined by the judgment below." *Nashville, C. & St. L. R. Co.* v. *Wallace,* 288 U. S. 249, 264. It was with respect to a state-originating declaratory judgment proceeding that we said, in *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 471, that "The extent to which the declaratory judgment procedure may be used in the federal courts to control state action lies in the sound discretion of the Court. . . ." Indeed, we have recognized, in such cases, that ". . . the discretionary element characteristic of declaratory jurisdiction, and imported perhaps from equity jurisdiction and practice without the remedial phase, offers a convenient instrument for making . . . effective . . ." the policy against premature constitutional decision. *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 573, n. 41.

Insofar as appellants seek to justify the exercise of our declaratory power by the threat of prosecution, facts which they can no more negative by complaint and demurrer than they could by stipulation preclude our determining their appeals on the merits. Cf. *Bartemeyer* v. *Iowa,* 18 Wall. 129, 134–135. It is clear that the mere existence of a state penal statute would constitute insufficient grounds to support a federal court's adjudication of its constitutionality in proceedings brought against the State's prosecuting officials if real threat of enforcement is wanting. See *Ex parte La Prade,* 289 U. S. 444, 458. If the prosecutor expressly agrees not to prosecute, a suit against him for declaratory and injunctive relief is not such an adversary case as will be reviewed here. *C. I. O.*

v. *McAdory,* 325 U. S. 472, 475. Eighty years of Connecticut history demonstrate a similar, albeit tacit agreement. The fact that Connecticut has not chosen to press the enforcement of this statute deprives these controversies of the immediacy which is an indispensable condition of constitutional adjudication. This Court cannot be umpire to debates concerning harmless, empty shadows. To find it necessary to pass on these statutes now, in order to protect appellants from the hazards of prosecution, would be to close our eyes to reality.

Nor does the allegation by the Poes and Doe that they are unable to obtain information concerning contraceptive devices from Dr. Buxton, "for the sole reason that the delivery and use of such information and advice may or will be claimed by the defendant State's Attorney to constitute offenses," disclose a necessity for present constitutional decision. It is true that this Court has several times passed upon criminal statutes challenged by persons who claimed that the effects of the statutes were to deter others from maintaining profitable or advantageous relations with the complainants. See, *e. g., Truax* v. *Raich,* 239 U. S. 33; *Pierce* v. *Society of Sisters,* 268 U. S. 510. But in these cases the deterrent effect complained of was one which was grounded in a realistic fear of prosecution. We cannot agree that if Dr. Buxton's compliance with these statutes is uncoerced by the risk of their enforcement, his patients are entitled to a declaratory judgment concerning the statutes' validity. And, with due regard to Dr. Buxton's standing as a physician and to his personal sensitiveness, we cannot accept, as the basis of constitutional adjudication, other than as chimerical the fear of enforcement of provisions that have during so many years gone uniformly and without exception unenforced.

Justiciability is of course not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures,

including the appropriateness of the issues for decision by this Court and the actual hardship to the litigants of denying them the relief sought. Both these factors justify withholding adjudication of the constitutional issue raised under the circumstances and in the manner in which they are now before the Court.

*Dismissed.*

MR. JUSTICE BLACK dissents because he believes that the constitutional questions should be reached and decided.

MR. JUSTICE BRENNAN, concurring in the judgment.

I agree that this appeal must be dismissed for failure to present a real and substantial controversy which unequivocally calls for adjudication of the rights claimed in advance of any attempt by the State to curtail them by criminal prosecution. I am not convinced, on this skimpy record, that these appellants as individuals are truly caught in an inescapable dilemma. The true controversy in this case is over the opening of birth-control clinics on a large scale; it is that which the State has prevented in the past, not the use of contraceptives by isolated and individual married couples. It will be time enough to decide the constitutional questions urged upon us when, if ever, that real controversy flares up again. Until it does, or until the State makes a definite and concrete threat to enforce these laws against individual married couples—a threat which it has never made in the past except under the provocation of litigation—this Court may not be compelled to exercise its most delicate power of constitutional adjudication.

MR. JUSTICE DOUGLAS, dissenting.

I.

These cases are dismissed because a majority of the members of this Court conclude, for varying reasons, that

this controversy does not present a justiciable question. That conclusion is too transparent to require an extended reply. The device of the declaratory judgment is an honored one. Its use in the federal system is restricted to "cases" or "controversies" within the meaning of Article III. The question must be "appropriate for judicial determination," not hypothetical, abstract, academic or moot. *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 240. It must touch "the legal relations of parties having adverse legal interests." *Id.,* 240–241. It must be "real and substantial" and admit of "specific relief through a decree of a conclusive character." *Id.,* 241. The fact that damages are not awarded or an injunction does not issue, the fact that there are no allegations of irreparable injury are irrelevant. *Id.,* 241. This is hornbook law. The need for this remedy in the federal field was summarized in a Senate Report as follows:

". . . it is often necessary, in the absence of the declaratory judgment procedure, to violate or purport to violate a statute in order to obtain a judicial determination of its meaning or validity." S. Rep. No. 1005, 73d Cong., 2d Sess., pp. 2–3.

If there is a case where the need for this remedy in the shadow of a criminal prosecution is shown, it is this one, as MR. JUSTICE HARLAN demonstrates. Plaintiffs in No. 60 are two sets of husband and wife. One wife is pathetically ill, having delivered a stillborn fetus. If she becomes pregnant again, her life will be gravely jeopardized. This couple have been unable to get medical advice concerning the "best and safest" means to avoid pregnancy from their physician, plaintiff in No. 61, because if he gave it he would commit a crime. The use of contraceptive devices would also constitute a crime. And it is alleged—and admitted by the State—that the State's Attorney intends to enforce the law by prosecuting offenses under the laws.

A public clinic dispensing birth-control information has indeed been closed by the State. Doctors and a nurse working in that clinic were arrested by the police and charged with advising married women on the use of contraceptives. That litigation produced *State* v. *Nelson,* 126 Conn. 412, 11 A. 2d 856, which upheld these statutes. That same police raid on the clinic resulted in the seizure of a quantity of the clinic's contraception literature and medical equipment and supplies. The legality of that seizure was in question in *State* v. *Certain Contraceptive Materials,* 126 Conn. 428, 11 A. 2d 863.

The Court refers to the *Nelson* prosecution as a "test case" and implies that it had little impact. Yet its impact was described differently by a contemporary observer who concluded his comment with this sentence: "This serious setback to the birth control movement [the *Nelson* case] led to the closing of all the clinics in the state, just as they had been previously closed in the state of Massachusetts." [1] At oral argument, counsel for appellants confirmed that the clinics are still closed. In response to a question from the bench, he affirmed that "no public or private clinic" has dared give birth-control advice since the decision in the *Nelson* case.[2]

These, then, are the circumstances in which the Court feels that it can, contrary to every principle of American or English common law,[3] go outside the record to con-

---

[1] Himes, A Decade of Progress in Birth Control, 212 Annals Am. Acad. Pol. & Soc. Sci. 88, 94 (1940).

[2] It may be, as some suggest, that these bizarre laws are kept on the books solely to insure that traffic in contraceptives will be furtive, or will be limited to those who, by the accident of their education, travels, or wealth, need not rely on local public clinics for instruction and supply. Yet these laws—as the decision below shows—are not limited to such situations.

[3] "On the continent there was some speculation during the middle ages as to whether a law could become inoperative through long-continued desuetude. In England, however, the idea of prescription

clude that there exists a "tacit agreement" that these statutes will not be enforced. No lawyer, I think, would advise his clients to rely on that "tacit agreement." No police official, I think, would feel himself bound by that "tacit agreement." After our national experience during the prohibition era, it would be absurd to pretend that all criminal statutes are adequately enforced. But that does not mean that bootlegging was the less a crime. Cf. *Costello* v. *United States*, 365 U. S. 265. In fact, an arbitrary administrative pattern of non-enforcement may increase the hardships of those subject to the law. See J. Goldstein, Police Discretion Not to Invoke the Criminal Process, 69 Yale L. J. 543.

When the Court goes outside the record to determine that Connecticut has adopted "The undeviating policy of nullification . . . of its anti-contraceptive laws," it selects a particularly poor case in which to exercise such a novel power. This is not a law which is a dead letter. Twice since 1940, Connecticut has re-enacted these laws as part of general statutory revisions. Consistently, bills to remove the statutes from the books have been rejected by the legislature. In short, the statutes—far from being the accidental left-overs of another era—are the center of a continuing controversy in the State. See, *e. g.,* The New Republic, May 19, 1947, p. 8.

Again, the Court relies on the inability of counsel to show any attempts, other than the *Nelson* case, "to enforce the prohibition of distribution or use of contraceptive devices by criminal process." Yet, on oral argument, counsel for the appellee stated on his own knowl-

and the acquisition or loss of rights merely by the lapse of a particular length of time found little favour. . . . There was consequently no room for any theory that statutes might become obsolete." Plucknett, A Concise History of the Common Law (1956), pp. 337–338.

edge that several proprietors had been prosecuted in the "minor police courts of Connecticut" after they had been "picked up" for selling contraceptives. The enforcement of criminal laws in minor courts has just as much impact as in those cases where appellate courts are resorted to. The need of the protection of constitutional guarantees, and the right to them, are not less because the matter is small or the court lowly. See *Thompson* v. *City of Louisville,* 362 U. S. 199; *Tumey* v. *Ohio,* 273 U. S. 510. Nor is the need lacking because the dispensing of birth-control information is by a single doctor rather than by birth-control clinics. The nature of the controversy would not be changed one iota had a dozen doctors, representing a dozen birth-control clinics, sued for remedial relief.

What are these people—doctor and patients—to do? Flout the law and go to prison? Violate the law surreptitiously and hope they will not get caught? By today's decision we leave them no other alternatives. It is not the choice they need have under the regime of the declaratory judgment and our constitutional system. It is not the choice worthy of a civilized society. A sick wife, a concerned husband, a conscientious doctor seek a dignified, discrete, orderly answer to the critical problem confronting them. We should not turn them away and make them flout the law and get arrested to have their constitutional rights determined. See *Railway Mail Assn.* v. *Corsi,* 326 U. S. 88. They are entitled to an answer to their predicament here and now.

## II.

The right of the doctor to advise his patients according to his best lights seems so obviously within First Amendment rights as to need no extended discussion. The leading cases on freedom of expression are generally framed

with reference to public debate and discourse. But as Chafee said, "the First Amendment and other parts of the law erect a fence inside which men can talk. The law-makers, legislators and officials stay on the outside of that fence. But what the men inside the fence say when they are let alone is no concern of the law." The Blessings of Liberty (1956), p. 108.

The teacher (*Sweezy* v. *New Hampshire,* 354 U. S. 234) as well as the public speaker (*Thomas* v. *Collins,* 323 U. S. 516) is included. The actor on stage or screen, the artist whose creation is in oil or clay or marble, the poet whose reading public may be practically nonexistent, the musician and his musical scores, the counselor whether priest, parent or teacher no matter how small his audience—these too are beneficiaries of freedom of expression. The remark by President James A. Garfield that his ideal of a college was a log in the woods with a student at one end and Mark Hopkins at another (9 Dict. Am. Biog., p. 216) puts the present problem in proper First Amendment dimensions. Of course a physician can talk freely and fully with his patient without threat of retaliation by the State. The contrary thought—the one endorsed *sub silentio* by the courts below—has the cast of regimentation about it, a cast at war with the philosophy and presuppositions of this free society.

We should say with Kant that "It is absurd to expect to be enlightened by Reason, and at the same time to prescribe to her what side of the question she must adopt." [4] Leveling the discourse of medical men to the morality of a particular community is a deadening influence. Mill spoke of the pressures of intolerant groups that produce "either mere conformers to commonplace, or time-servers for truth." [5] We witness in this case a sealing of the lips of a doctor because he desires to observe

---

[4] The Critique of Pure Reason, 42 Great Books, p. 221.

[5] On Liberty of Thought and Discussion, 43 Great Books, p. 282.

the law, obnoxious as the law may be. The State has no power to put any sanctions of any kind on him for any views or beliefs that he has or for any advice he renders. These are his professional domains into which the State may not intrude. The chronicles are filled with sad attempts of government to stomp out ideas, to ban thoughts because they are heretical or obnoxious. As Mill stated, "Our merely social intolerance kills no one, roots out no opinions, but induces men to disguise them, or to abstain from any active effort for their diffusion." [6] When that happens society suffers. Freedom working underground, freedom bootlegged around the law is freedom crippled. A society that tells its doctors under pain of criminal penalty what they may not tell their patients is not a free society. Only free exchange of views and information is consistent with "a civilization of the dialogue," to borrow a phrase from Dr. Robert M. Hutchins. See *Wieman* v. *Updegraff*, 344 U. S. 183, 197 (concurring opinion).

## III.

I am also clear that this Connecticut law as applied to this married couple deprives them of "liberty" without due process of law, as that concept is used in the Fourteenth Amendment.

The first eight Amendments to the Constitution have been made applicable to the States only in part. My view has been that when the Fourteenth Amendment was adopted, its Due Process Clause incorporated all of those Amendments. See *Adamson* v. *California*, 332 U. S. 46, 68 (dissenting opinion). Although the history of the Fourteenth Amendment may not be conclusive, the words "due process" acquired specific meaning from Anglo-American experience. [7] As MR. JUSTICE BRENNAN re-

---

[6] *Ibid.*

[7] See Konvitz, Fundamental Liberties of a Free People (1957), pp. 37–39; Green, The Bill of Rights, the Fourteenth Amendment

cently stated, "The Bill of Rights is the primary source of expressed information as to what is meant by constitutional liberty. The safeguards enshrined in it are deeply etched in the foundations of America's freedoms." The Bill of Rights and the States (1961), 36 N. Y. U. L. Rev. 761, 776. When the Framers wrote the Bill of Rights they enshrined in the form of constitutional guarantees those rights—in part substantive, in part procedural—which experience indicated were indispensable to a free society. Some would disagree as to their importance; the debate concerning them did indeed start before their adoption and has continued to this day. Yet the constitutional conception of "due process" must, in my view, include them all until and unless there are amendments that remove them. That has indeed been the view of a full court of nine Justices, though the members who make up that court unfortunately did not sit at the same time.[8]

Though I believe that "due process" as used in the Fourteenth Amendment includes all of the first eight Amendments, I do not think it is restricted and confined to them. We recently held that the undefined "liberty" in the Due Process Clause of the Fifth Amendment includes freedom to travel. *Kent* v. *Dulles,* 357 U. S. 116, 125–127. Cf. *Edwards* v. *California,* 314 U. S. 160,

---

and the Supreme Court, 46 Mich. L. Rev. 869, 904 *et seq.* (1948); Holmes, The Fourteenth Amendment and the Bill of Rights, 7 S. C. L. Q. Rev. 596 (1955).

And see Mr. Justice Rutledge (concurring) in *In re Oliver,* 333 U. S. 257, 280–281.

[8] I start with Justices Bradley, Swayne, Field, Clifford and Harlan. To this number, Mr. Justice Brewer can probably be joined on the basis of his agreement "in the main" with Mr. Justice Harlan in *O'Neil* v. *Vermont,* 144 U. S. 323, 371. See the Appendix to MR. JUSTICE BLACK's dissent in *Adamson* v. *California, supra,* 120–123. To these I add MR. JUSTICE BLACK, Mr. Justice Murphy, Mr. Justice Rutledge and myself (*Adamson* v. *California, supra,* 68, 123).

177, 178 (concurring opinion). The right "to marry, establish a home and bring up children" was said in *Meyer* v. *Nebraska*, 262 U. S. 390, 399, to come within the "liberty" of the person protected by the Due Process Clause of the Fourteenth Amendment. As I indicated in my dissent in *Public Utilities Comm'n* v. *Pollak*, 343 U. S. 451, 467, "liberty" within the purview of the Fifth Amendment includes the right of "privacy," a right I thought infringed in that case because a member of a "captive audience" was forced to listen to a government-sponsored radio program. "Liberty" is a conception that sometimes gains content from the emanations of other specific guarantees (*N. A. A. C. P.* v. *Alabama*, 357 U. S. 449, 460) or from experience with the requirements of a free society.

For years the Court struck down social legislation when a particular law did not fit the notions of a majority of Justices as to legislation appropriate for a free enterprise system. Mr. Justice Holmes, dissenting, rightly said that "a constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or of *laissez faire*. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States." *Lochner* v. *New York*, 198 U. S. 45, 75–76.

The error of the old Court, as I see it, was not in entertaining inquiries concerning the constitutionality of social legislation but in applying the standards that it did. See *Tot* v. *United States*, 319 U. S. 463; *Giboney* v. *Empire Storage Co.*, 336 U. S. 490. Social legislation dealing with business and economic matters touches no particularized prohibition of the Constitution, unless it be

the provision of the Fifth Amendment that private property should not be taken for public use without just compensation. If it is free of the latter guarantee, it has a wide scope for application. Some go so far as to suggest that whatever the majority in the legislature says goes (cf. *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 64), that there is no other standard of constitutionality. That reduces the legislative power to sheer voting strength and the judicial function to a matter of statistics. As Robert M. Hutchins has said, "It is obviously impossible to raise questions of freedom and justice if the sole duty of the court is to decide whether the case at bar falls within the scope of the duly issued command of a duly constituted sovereign." Two Faces of Federalism (1960), p. 18. While the legislative judgment on economic and business matters is "well-nigh conclusive" (*Berman* v. *Parker,* 348 U. S. 26, 32), it is not beyond judicial inquiry. Cf. *United States* v. *Oregon,* 366 U. S. 643, 649 (dissenting opinion).

The regime of a free society needs room for vast experimentation. Crises, emergencies, experience at the individual and community levels produce new insights; problems emerge in new dimensions; needs, once never imagined, appear. To stop experimentation and the testing of new decrees and controls is to deprive society of a needed versatility. Yet to say that a legislature may do anything not within a specific guarantee of the Constitution may be as crippling to a free society as to allow it to override specific guarantees so long as what it does fails to shock the sensibilities of a majority of the Court.[9]

---

[9] "The due process clause is said to exact from the states all that is 'implicit in the concept of ordered liberty.' It is further said that the concept is a living one, that it guarantees basic rights, not because they have become petrified as of any one time, but because due process follows the advancing standards of a free society as to what

The present legislation is an excellent example. If a State banned completely the sale of contraceptives in drug stores, the case would be quite different. It might seem to some or to all judges an unreasonable restriction. Yet it might not be irrational to conclude that a better way of dispensing those articles is through physicians. The same might be said of a state law banning the manufacture of contraceptives. Health, religious, and moral arguments might be marshalled pro and con. Yet it is not for judges to weigh the evidence. Where either the sale or the manufacture is put under regulation, the strictures are on business and commercial dealings that have had a long history with the police power of the States.

The present law, however, deals not with sale, not with manufacture, but with *use*. It provides:

> "Any person who uses any drug, medicinal article or instrument for the purpose of preventing conception shall be fined not less than fifty dollars or imprisoned not less than sixty days nor more than one year or be both fined and imprisoned." Conn. Gen. Stat., 1958, § 53–32.

The regulation as applied in this case touches the relationship between man and wife. It reaches into the intimacies of the marriage relationship. If we imagine a regime of full enforcement of the law in the manner of

---

is deemed reasonable and right. It is to be applied, according to this view, to facts and circumstances as they arise, the cases falling on one side of the line or the other as a majority of nine justices appraise conduct as either implicit in the concept of ordered liberty or as lying without the confines of that vague concept. Of course, in this view, the due process clause of the Fifth Amendment, which confessedly must be construed like that of the Fourteenth, may be repetitious of many of the other guaranties of the first eight amendments and may render many of their provisions superfluous." Roberts, The Court and the Constitution (1951), p. 80.

an Anthony Comstock,[10] we would reach the point where search warrants issued and officers appeared in bedrooms to find out what went on.[11] It is said that this is not that case. And so it is not. But when the State makes "use" a crime and applies the criminal sanction to man

---

[10] Anthony Comstock (1844–1915)—the Congregationalist who inspired the foundation of the New York Society for the Suppression of Vice in 1873 and the Watch and Ward Society of Boston in 1876 and who inspired George Bernard Shaw to use the opprobrious word "comstockery" in Mrs. Warren's Profession—was responsible for the passage in 1879 of this Connecticut law.

"Anthony Comstock had moral earnestness and it can't be faked. His concern was with Puritan theology rather than Puritan ethics. Righteousness seemed to him less important than salvation and consequently tricks which seemed shabby to neutrals left him without shame. A man who fights for the safety of his immortal soul can hardly be expected to live up to the best Queensberry traditions in the clinches. To grant the major premises of Comstock's religious and social philosophy is to acquit him of any lack of logic. Obscenity was to Anthony poison to soul and body, and anything remotely touching upon sex was to his mind obscene. He seems to have believed implicitly in medical theories which have since his time been discarded. Even in his day beliefs were changing, but Comstock was loyal to the old-line ideas. It was his notion that idiocy, epilepsy and locomotor-ataxia were among the ailments for which auto-eroticism was responsible. Since death and damnation might be, according to his belief, the portion of the girl or boy who read a ribald story, it is easy to understand why he was so impatient with those who advanced the claims of art. Even those who love beauty would hardly be prepared to burn in hell forever in its service. Comstock's decision was even easier, for he did not know, understand or care anything about beauty." Broun and Leech, Anthony Comstock (1927), pp. 265–266.

[11] Those warrants would, I think, go beyond anything so far known in our law. The law has long known the writ *de ventre inspiciendo* authorizing matrons to inspect the' body of a woman to determine if she is pregnant. This writ was issued to determine before a hanging whether a convicted female was pregnant or to ascertain whether rightful succession of property was to be defeated by assertion of a supposititious heir. See 1 Blackstone Commentaries (Jones ed. 1915), p. 651.

and wife, the State has entered the innermost sanctum of the home. If it can make this law, it can enforce it. And proof of its violation necessarily involves an inquiry into the relations between man and wife.

That is an invasion of the privacy that is implicit in a free society. A noted theologian who conceives of the use of a contraceptive as a "sin" nonetheless admits that a "use" statute such as this enters a forbidden domain.

> ". . . the Connecticut statute confuses the moral and legal, in that it transposes without further ado a private sin into a public crime. The criminal act here is the private use of contraceptives. The real area where the coercions of law might, and ought to, be applied, at least to control an evil—namely, the contraceptive industry—is quite overlooked. As it stands, the statute is, of course, unenforceable without police invasion of the bedroom, and is therefore indefensible as a piece of legal draughtsmanship." Murray, We Hold These Truths (1960), pp. 157–158.

This notion of privacy is not drawn from the blue.[12] It emanates from the totality of the constitutional scheme under which we live.[13]

> "One of the earmarks of the totalitarian understanding of society is that it seeks to make all

---

[12] The right "to be let alone" had many common-law overtones. See Cooley, Torts (2d ed. 1888), p. 29; Warren and Brandeis, Right To Privacy, 4 Harv. L. Rev. 192. Cf. Ohio Rev. Code, § 2905.34, which makes criminal knowing "possession" of "a drug, medicine, article, or thing intended for the prevention of conception," doctors and druggists being excepted. § 2905.37.

[13] Mr. Justice Murphy dissenting in *Adamson* v. *California,* 332 U. S. 46, 124, said:

"I agree that the specific guarantees of the Bill of Rights should be carried over intact into the first section of the Fourteenth Amendment. But I am not prepared to say that the latter is entirely and necessarily limited by the Bill of Rights. Occasions may arise where

subcommunities—family, school, business, press, church—completely subject to control by the State. The State then is not one vital institution among others: a policeman, a referee, and a source of initiative for the common good. Instead, it seeks to be coextensive with family and school, press, business community, and the Church, so that all of these component interest groups are, in principle, reduced to organs and agencies of the State. In a democratic political order, this megatherian concept is expressly rejected as out of accord with the democratic understanding of social good, and with the actual make-up of the human community." [14]

Can there be any doubt that a Bill of Rights that in time of peace bars soldiers from being quartered in a home "without the consent of the Owner" [15] should also bar the police from investigating the intimacies of the marriage relation? The idea of allowing the State that leeway is congenial only to a totalitarian regime.

I dissent from a dismissal of these cases and our refusal to strike down this law.

MR. JUSTICE HARLAN, dissenting.

I am compelled, with all respect, to dissent from the dismissal of these appeals. In my view the course which the Court has taken does violence to established concepts

---

a proceeding falls so far short of conforming to fundamental standards of procedure as to warrant constitutional condemnation in terms of a lack of due process despite the absence of a specific provision in the Bill of Rights."

[14] Calhoun, Democracy and Natural Law, 5 Nat. Law Forum, 31, 36 (1960).

[15] The Third Amendment provides:

"No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."

of "justiciability," and unjustifiably leaves these appellants under the threat of unconstitutional prosecution. Regrettably, an adequate exposition of my views calls for a dissenting opinion of unusual length.

Between them these suits seek declaratory relief against the threatened enforcement of Connecticut's antibirth-control laws making criminal the use of contraceptives, insofar as such laws relate to the use of contraceptives by married persons and the giving of advice to married persons in their use.[1] The appellants, a married couple, a married woman, and a doctor, ask that it be adjudged, contrary to what the Connecticut courts have held, that such laws, as threatened to be applied to them in circumstances described in the opinion announcing the judgment of the Court (*ante*, pp. 498–500), violate the Fourteenth Amendment, in that they deprive appellants of life, liberty, or property without due process.

The plurality opinion of the Court gives, as the basis for dismissing the appeals, the reason that, as to the two married appellants, the lack of demonstrated enforcement of the Connecticut statute bespeaks an absence of exigent adversity which is posited as the condition for evoking adjudication from us, and, as to the doctor, that his compliance with the state statute is uncoerced by any "realistic fear of prosecution," giving due recognition to his "standing as a physician and to his personal sensitiveness." With these reasons it appears that the concurring opinion agrees.

In *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 462, it was said that "declaratory judgment procedure may be resorted to only in the sound discretion of the Court and where the interests of justice will be

---

[1] These statutes, Conn. Gen. Stat., Rev. 1958, § 53–32 (forbidding the use of contraceptives), and Conn. Gen. Stat., Rev. 1958, § 54–196 (the general accessory law), are set forth in note 2 of the plurality opinion, *ante,* p. 499.

advanced and an adequate and effective judgment may be rendered." In my view of these cases a present determination of the Constitutional issues is the only course which will advance justice, and I can find no sound reason born of considerations as to the possible inadequacy or ineffectiveness of the judgment that might be rendered which justifies the Court's contrary disposition. While ordinarily I would not deem it appropriate to deal, in dissent, with Constitutional issues which the Court has not reached, I shall do so here because such issues, as I see things, are entangled with the Court's conclusion as to the nonjusticiability of these appeals.

### Part One.

### *Justiciability.*

There can be no quarrel with the plurality opinion's statement that "Justiciability is of course not a legal concept with a fixed content or susceptible of scientific verification," but, with deference, the fact that justiciability is not precisely definable does not make it ineffable. Although a large number of cases are brought to bear on the conclusion that is reached, I think it is fairly demonstrable that the authorities fall far short of compelling dismissal of these appeals.[2] Even so, it is suggested that the cases

---

[2] Only two cases are squarely relied on, *C. I. O.* v. *McAdory*, 325 U. S. 472, a companion case to *Alabama State Federation of Labor* v. *McAdory, supra,* discussed at pp. 526–527, *infra,* and tendering the same issues; and *Ex parte La Prade,* 289 U. S. 444. The appeal in the principal *McAdory* case was dismissed because the state statute there challenged had not yet been construed by the state courts, and it was thought that state construction might remove some Constitutional doubts. In the companion *McAdory* case, the appeal was likewise dismissed, the State having "agreed not to enforce § 7 of the Act [there challenged] until the final decision as to the section's validity by this Court in *Alabama State Federation of Labor* v. *McAdory* . . . ." *Id.,* at 475. In the present appeals there is

do point the way to a "rigorous insistence on exigent adversity" and a "policy against premature constitutional decision," which properly understood does indeed demand that result.

The policy referred to is one to which I unreservedly subscribe. Without undertaking to be definitive, I would suppose it is a policy the wisdom of which is woven of several strands: (1) Due regard for the fact that the source of the Court's power lies ultimately in its duty to decide, in conformity with the Constitution, the particular controversies which come to it, and does not arise from some generalized power of supervision over state and national legislatures; (2) therefore it should insist that litigants bring to the Court interests and rights which require present recognition and controversies demanding immediate resolution; (3) also it follows that the controversy must be one which is in truth and fact the litigant's own, so that the clash of adversary contest which is needed to sharpen and illuminate issues is present and gives that aid on which our adjudicatory system has come to rely; (4) finally, it is required that other means of redress for the particular right claimed be unavailable, so that the process of the Court may not become overburdened and conflicts with other courts or departments of government may not needlessly be created, which might come about if either those truly affected are not the ones demanding relief, or if the relief we can give is not truly needed.

In particularization of this composite policy the Court, in the course of its decisions on matters of justiciability, has developed and given expression to a number of important limitations on the exercise of its jurisdiction, the

no agreement not to prosecute, no companion,case awaiting disposition, and no uncertainty about state law due to lack of state construction.

As to *Ex parte La Prade, supra,* see note 11, *infra.*

presence or absence of which here should determine the justiciability of these appeals. Since all of them are referred to here in one way or another, it is well to proceed to a disclosure of those which are *not* involved in the present appeals, thereby focusing attention on the one factor on which reliance appears to be placed by both the plurality and concurring opinions in this instance.

*First:* It should by now be abundantly clear that the fact that only Constitutional claims are presented in proceedings seeking *anticipatory* relief against state criminal statutes does not for that reason alone make the claims premature. See, *e. g., Terrace* v. *Thompson,* 263 U. S. 197; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Euclid* v. *Ambler Co.,* 272 U. S. 365. Whatever general pronouncements may be found to the contrary must, in context, be seen to refer to considerations quite different from anything present in these cases.

Thus in *Alabama State Federation of Labor* v. *McAdory, supra,* anticipatory relief was withheld for the precise reason that normally this Court ought not to consider the Constitutionality of a state statute in the absence of a controlling interpretation of its meaning and effect by the state courts. To the same effect see *Parker* v. *Los Angeles County,* 338 U. S. 327; *Watson* v. *Buck,* 313 U. S. 387; *Beal* v. *Missouri Pacific R. Co.,* 312 U. S. 45. Indeed, without belaboring the point, the principle that anticipatory relief against state criminal statutes is not unavailable as a general matter may best be illustrated by several cases recently decided in this Court. In *Harrison* v. *N. A. A. C. P.,* 360 U. S. 167, the premise of our action was that anticipatory relief should be obtained, if possible—with review here on certiorari or appeal—in a state court which could then authoritatively construe a new and ambiguous state statute; only if such relief were unavailable, should a Federal District Court exercise its

statutory jurisdiction. And in our recent decisions upholding the Constitutionality of state Sunday-closing laws, 366 U. S. 420, *et seq.,* not one of the opinions paused even slightly over the appropriateness of anticipatory relief, although in one case that issue was argued, *Gallagher* v. *Crown Kosher Super Market,* 366 U. S. 617.

Hence, any language in the cases where the Court has abstained from exercising its jurisdiction, to the effect that we should not "entertain constitutional questions in advance of the strictest necessity," *Parker* v. *Los Angeles County, supra,* at 333, is not at all apposite in the present cases. For these appeals come to us from the highest court of Connecticut, thus affording us—in company with previous state interpretations of the same statute—a clear construction of the scope of the statute, thereby in effect assuring that our review constitutes no greater interference with state administration than the state procedures themselves allow.

*Second:* I do not think these appeals may be dismissed for want of "ripeness" as that concept has been understood in its "varied applications."[3] There is no lack of "ripeness" in the sense that is exemplified by cases such as *Stearns* v. *Wood,* 236 U. S. 75; *Electric Bond & Share Co.* v. *Securities & Exchange Comm'n,* 303 U. S. 419; *United Public Workers* v. *Mitchell,* 330 U. S. 75; *Inter-*

---

[3] Manifestly the type of ripeness found wanting in cases such as *Massachusetts* v. *Mellon,* 262 U. S. 447, *Texas* v. *Interstate Commerce Comm'n,* 258 U. S. 158, *New Jersey* v. *Sargent,* 269 U. S. 328, and *Arizona* v. *California,* 283 U. S. 423, is not lacking in the cases before us. For the recurrent theme of those cases, all of which challenge federal action as an encroachment on state sovereignty, is the fact that the mere existence of state sovereign powers and prerogatives which may bear generally upon individual rights raises no such concrete and practical issues as courts are accustomed to consider, so that adjudication upon their validity in such circumstances would take place in the most abstract kind of setting.

*national Longshoremen's Union* v. *Boyd,* 347 U. S. 222; and perhaps again *Parker* v. *Los Angeles County, supra.* In all of those cases the lack of ripeness inhered in the fact that the need for some further procedure, some further contingency of application or interpretation, whether judicial, administrative or executive, or some further clarification of the intentions of the claimant, served to make remote the issue which was sought to be presented to the Court. Certainly the appellants have stated in their pleadings fully and unequivocally what it is that they intend to do; no clarifying or resolving contingency stands in their way before they may embark on that conduct. Thus there is no circumstance besides that of detection or prosecution to make remote the particular controversy. And it is clear beyond cavil that the mere fact that a controversy such as this is rendered still more unavoidable by an actual prosecution, is not *alone* sufficient to make the case too remote, not ideally enough "ripe" for adjudication, at the prior stage of anticipatory relief.

Moreover, it follows from what has already been said that there is no such want of ripeness as was presented in *Rescue Army* v. *Municipal Court,* 331 U. S. 549, or in our recent decisions dismissing the appeals in *Atlanta Newspapers* v. *Grimes,* 364 U. S. 290, and *United States* v. *Fruehauf,* 365 U. S. 146, where the records presented for adjudication a controversy so artificially truncated as to make the cases not susceptible to intelligent decision. I cannot see what further elaboration is required to enable us to decide the appellants' claims, and indeed neither the plurality opinion nor the concurring opinion—notwithstanding the latter's characterization of this record as "skimpy"— suggests what more grist is needed before the judicial mill could turn.

*Third:* This is not a feigned, hypothetical, friendly or colorable suit such as discloses "a want of a truly adversary

contest." Clearly these cases are not analogous to *Wood-Paper Co.* v. *Heft,* 8 Wall. 333, or *South Spring Hill Gold Mining Co.* v. *Amador Medean Gold Mining Co.,* 145 U. S. 300, where prior to consideration the controversy in effect became moot by the merger of the two contesting interests. Nor is there any question of collusion as in *Lord* v. *Veazie,* 8 How. 251, or in *United States* v. *Johnson,* 319 U. S. 302. And there is nothing to suggest that the parties by their conduct of this litigation have cooperated to force an adjudication of a Constitutional issue which— were the parties interested solely in winning their cases rather than obtaining a Constitutional decision—might not arise in an arm's-length contested proceeding. Such was the situation in *Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S. 339, where the parties sought a ruling as to whether a particular passenger rate was unconstitutionally confiscatory, having stipulated all the debatable and contingent facts which otherwise might have rendered a Constitutional decision unnecessary.

In the present appeals no more is alleged or conceded than is consistent with undisputed facts and with ordinary practice in deciding a case for anticipatory relief on demurrer. I think it is unjustifiably stretching things to assume that appellants are not deterred by the threat of prosecution from engaging in the conduct in which they assert a right to engage, or to assume that appellee's demurrer to the proposition that he asserts the right to enforce the statute against appellants at any time he chooses is anything but a candid one.

Indeed, as will be developed below, I think both the plurality and concurring opinions confuse on this score the predictive likelihood that, had they not brought themselves to appellee's attention, he would not enforce the statute against them, with some entirely suppositious "tacit agreement" not to prosecute, thereby ignoring the

prosecutor's claim, asserted in these very proceedings, of a right, at his unbounded prosecutorial discretion, to enforce the statute.

*Fourth:* The doctrine of the cases dealing with a litigant's lack of standing to raise a Constitutional claim is said to justify the dismissal of these appeals. The precedents put forward as examples of this doctrine, see the plurality opinion, note 5, as well as cases such as *Frothingham* v. *Mellon* and *Massachusetts* v. *Mellon,* 262 U. S. 447, and *Texas* v. *Interstate Commerce Comm'n,* 258 U. S. 158, do indeed stand for the proposition that a legal claim will not be considered at the instance of one who has no real and concrete interest in its vindication. This is well in accord with the grounds for declining jurisdiction suggested above. But this doctrine in turn needs further particularization lest it become a catchall for an unarticulated discretion on the part of this Court to decline to adjudicate appeals involving Constitutional issues.

There is no question but that appellants here are asserting rights which are peculiarly their own, and which, if they are to be raised at all, may be raised most appropriately by them. Cf. *Tileston* v. *Ullman,* 318 U. S. 44; *Texas* v. *Interstate Commerce Comm'n, supra; Yazoo & Mississippi Valley R. Co.* v. *Jackson Vinegar Co.,* 226 U. S. 217; *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341 (concurring opinion). Nor do I understand the argument to be that this is the sort of claim which is too remote ever to be pressed by anyone, because no one is ever sufficiently involved. Cf. *Massachusetts* v. *Mellon, Frothingham* v. *Mellon, supra.* Thus, in truth, it is not the parties pressing this claim but the occasion chosen for pressing it which is objected to. But as has been shown the fact that it is anticipatory relief which is asked cannot of itself make the occasion objectionable.

We are brought, then, to the precise failing in these proceedings which is said to justify refusal to exercise our mandatory appellate jurisdiction: that there has been but one recorded Connecticut case dealing with a *prosecution* under the statute.[4] The significance of this lack of recorded evidence of prosecutions is said to make the presentation of appellants' rights too remote, too contingent, too hypothetical for adjudication in the light of the policies already considered. See pp. 526–530, *supra.* In my view it is only as a result of misconceptions both about the purport of the record before us and about the nature of the rights appellants put forward that this conclusion can be reached.

As far as the record is concerned, I think it is pure conjecture, and indeed conjecture which to me seems contrary to realities, that an open violation of the statute by a doctor (or more obviously still by a birth-control clinic) would not result in a substantial threat of prosecution. Crucial to the opposite conclusion is the description of the 1940 prosecution instituted in *State v. Nelson*, 126 Conn. 412, 11 A. 2d 856, as a "test case" which, as it is viewed, scarcely even punctuates the uniform state practice of nonenforcement of this statute. I read the history of Connecticut enforcement in a very different light. The *Nelson* case, as appears from the state court's opinion, was a prosecution of two doctors and a nurse for aiding and abetting violations of this statute by married women in prescribing and advising the use of contraceptive materials by them. It is true that there is

---

[4] Some support is sought to be drawn for the supposition of state acquiescence in violation of the statute from the case of *State v. Certain Contraceptive Materials,* 126 Conn. 428, 11 A. 2d 863. But that case held no more than that contraceptive materials could not be seized under the authority of a statute interpreted to deal with the seizure of gambling paraphernalia.

evidence of a customary unwillingness to enforce the statute prior to *Nelson,* for in that case the prosecutor stated to the trial court in a later motion to discontinue the prosecutions that "When this Waterbury clinic [operated by the defendants] was opened there were in open operation elsewhere in the State at least eight other contraceptive clinics which had been in existence for a long period of time and no questions as to their right to operate had been raised . . . ." [5]

What must also be noted is that the prosecutor followed this statement with an explanation that the primary purpose of the prosecution was to provide clear warning to all those who, like Nelson, might rely on this practice of nonenforcement. He stated that the purpose of the prosecution was:

> "the establishment of the constitutional validity and efficacy of the statutes under which these accused are informed against. Henceforth any person, whether a physician or layman, who violates the provisions of these statutes, must expect to be prosecuted and punished in accordance with the literal provisions of the law." [6]

---

[5] The "circumstances" of the *Nelson* case may best be gathered from the remarks of the State's prosecuting attorney, Mr. Fitzgerald, seeking the approval of the trial judge for a *nolle prosequi* in that case after the decision of the State Supreme Court. In an affidavit accompanying a transcript of the proceedings on the State's motion, the attorney for the defendants stated that "said criminal prosecutions were prosecutions instituted by the State upon complaint of a citizen and were instituted in no sense with the prior knowledge or approval of the accused and there was no pre-trial acquiescence by the accused that said actions would be instituted to test the constitutionality of the statutes in question."

[6] This statement was made in the same proceedings referred to in note 5, *supra.*

Thus the respect in which *Nelson* was a test case is only that it was brought for the purpose of making entirely clear the State's power and willingness to enforce against "*any* person, whether a physician or layman" (emphasis supplied), the statute and to eliminate from future cases the very doubt about the existence of these elements which had resulted in eight open birth-control clinics, and which would have made unfair the conviction of Nelson.

The plurality opinion now finds, and the concurring opinion must assume, that the only explanation of the absence of recorded prosecutions subsequent to the *Nelson* case is that Connecticut has renounced that *intention to prosecute and punish "any* person . . . in accordance with the literal provisions of the law" which it announced in *Nelson*. But if renunciation of the purposes of the *Nelson* prosecution is consistent with a lack of subsequent prosecutions, success of that purpose is no less consistent with this lack. I find it difficult to believe that doctors generally—and not just those operating specialized clinics—would continue openly to disseminate advice about contraceptives after *Nelson* in reliance on the State's supposed unwillingness to prosecute, or to consider that high-minded members of the profession would in consequence of such inaction deem themselves warranted in disrespecting this law so long as it is on the books. Nor can I regard as "chimerical" the fear of enforcement of these provisions that seems to have caused the disappearance of at least nine birth-control clinics.[7] In short, I fear that the Court has indulged in a bit of sleight of hand to be rid of this case. It has treated the significance of the absence of prosecutions during the twenty years since *Nelson* as identical with that of the absence of prosecutions during the years before

---

[7] See Brief of Planned Parenthood Federation of America, Inc., as *amicus curiae*, p. 4, and Appendix f.

*Nelson.* It has ignored the fact that the very purpose of the *Nelson* prosecution was to change defiance into compliance. It has ignored the very possibility that this purpose may have been successful.[8] The result is to postu-

[8] The concurring opinion concludes, apparently on the basis of the *Nelson* episode, that the "true controversy in this case is over the opening of birth-control clinics on a large scale . . . ." It should be said at once that as to *these* appeals this is an entirely unwarranted assumption. The *amicus curiae* in this case, the Planned Parenthood Federation of America, Inc., is indeed interested in such clinics, see note 7, *supra,* but as to the actual parties here, there is not one word in the record or their briefs to suggest that their interest is anything other than they say it is. The *Nelson* prosecution, it is true, involved a doctor and nurses at a birth-control clinic, but there is nothing about these statutes as they have been authoritatively construed in this and previous cases, that limits their application to advice given by a doctor in a clinic of that sort, as opposed to advice given by a doctor in some less specialized clinic, a hospital or in his own office.

The only conceivable sense in which "The true controversy in this case is over the opening of birth-control clinics" must lie in the circumstance that since the notorious and avowed purpose of such a clinic is the violation of these statutes, there would not be the same problem of detection or proof of violations as might otherwise present itself. The relevance in turn of this circumstance must be that, in the view of the concurring opinion there is a present threat of enforcement against any such clinic—which I too believe—but coupled with a further assumption—one shared by the plurality opinion though lacking any factual warrant whatever—that these statutes do not also deter members of the medical profession in general from violating these statutes. Furthermore both opinions must share the assumption that the appellants may be required to hold what may be their constitutional rights at the whim and pleasure of the prosecutor. In sum, the strong implication of the concurring opinion that a suit for anticipatory relief brought by a birth-control clinic (though it would raise no different issues and present a record no less "skimpy") would succeed in invoking our jurisdiction where these suits fail, exposes the fallacy underlying the Court's disposition: the unprecedented doctrine that a suit for anticipatory relief will be entertained at the instance of one who is forced to violate a statute flagrantly, but not at the urging of one who may violate it surreptitiously with a high probability of avoiding detection.

late a security from prosecution for open defiance of the statute which I do not believe the record supports.[9]

These considerations alone serve to bring appellants so squarely within the rule of *Pierce* v. *Society of Sisters,* 268 U. S. 510, and *Truax* v. *Raich,* 239 U. S. 33, that further demonstration would be pointless.

But even if Dr. Buxton were not in the litigation and appellants the Poes and Doe were seeking simply to use contraceptives without any need of consulting a physician beforehand—which is not the case we have, although it is the case which the plurality opinion of the Court is primarily concerned to discuss—even then I think that it misconceives the concept of justiciability and the nature of these appellants' rights to say that the failure of the State to carry through any criminal prosecution requires dismissal of their appeals.

The Court's disposition assumes that to decide the case now, in the absence of any consummated prosecutions, is unwise because it forces a difficult decision in advance of any exigent necessity therefor. Of course it is abundantly clear that this requisite necessity can exist prior to any actual prosecution, for that is the theory of anticipatory relief, and is by now familiar law. What must be relied on, therefore, is that the historical absence of prosecutions in some way leaves these appellants free to violate the statute without fear of prosecution, whether or not the law is Constitutional, and thus absolves us from the duty of deciding if it is. Despite the sug-

---

[9] In this regard it is worth comparing the record of the Federal Communications Commission in enforcing its regulations by means of a threat of revocation of station licenses. The Commission has not, as is generally known, used this sanction much more readily than Connecticut has invoked criminal penalties to enforce the laws here in question, but no one would discount entirely the efficacy of the threat or suggest that open defiance of Commission regulations is without substantial risks.

gestion of a "tougher and truer law" of immunity from criminal prosecution and despite speculation as to a "tacit agreement" that this law will not be enforced, there is, of course, no suggestion of an estoppel against the State if it should attempt to prosecute appellants. Neither the plurality nor the concurring opinion suggests that appellants have some legally cognizable right not to be prosecuted if the statute is Constitutional. What is meant is simply that the appellants are more or less free to act without fear of prosecution because the prosecuting authorities of the State, in their discretion and at their whim, are, as a matter of prediction, unlikely to decide to prosecute.

Here is the core of my disagreement with the present disposition. As I will develop later in this opinion, the most substantial claim which these married persons press is their right to enjoy the privacy of their marital relations free of the enquiry of the criminal law, whether it be in a prosecution of them or of a doctor whom they have consulted. And I cannot agree that their enjoyment of this privacy is not substantially impinged upon, when they are told that if they use contraceptives, indeed whether they do so or not, the only thing which stands between them and being forced to render criminal account of their marital privacy is the whim of the prosecutor.[10] Connecticut's highest court has told us in the clearest terms that, given proof, the prosecutor will succeed if he decides to bring a proceeding against one of the appellants for taking

[10] It is suggested that prosecution is unlikely because of an interspousal testimonial privilege in Connecticut. Assuming that such a privilege exists and is applicable here, the testimony of either spouse is not necessary to a conviction. Furthermore, as will be argued, the real incursion here inheres in the institution of a prosecution in this matter at all, with the consequent need of an opportunity for the parties—guilty or innocent—to defend themselves against the charges. See p. 548, *infra*.

the precise actions appellants have announced they intend to take. The State Court does not agree that there has come into play a "tougher and truer law than the dead words of the written text," and in the light of twelve unsuccessful attempts since 1943 to change this legislation, *Poe* v. *Ullman,* 147 Conn. 48, 56, 156 A. 2d 508, 513, n. 2, this position is not difficult to understand. Prosecution and conviction for the clearly spelled-out actions the appellants wish to take is not made unlikely by any fortuitous factor outside the control of the parties, nor is it made uncertain by possible variations in the actions appellants actually take from those the state courts have already passed upon. All that stands between the appellants and jail is the legally unfettered whim of the prosecutor and the Constitutional issue this Court today refuses to decide.

If we revert again to the reasons underlying our reluctance to exercise a jurisdiction which technically we possess, and the concrete expression of those underlying reasons in our cases, see pp. 526–531, *supra,* then I think it must become clear that there is no justification for failing to decide these married persons' appeals. The controversy awaits nothing but an actual prosecution, and, as will be shown, the substantial damage against which these appellants, Mrs. Doe and the Poes, are entitled to protection will be accomplished by such a prosecution, whatever its outcome in the state courts or here. By the present decision, although as a general matter the parties would be entitled to our review in an anticipatory proceeding which the State allowed to be instituted in its courts, these appellants are made to await actual prosecution before we will hear them. Indeed it appears that whereas appellants would surely have been entitled to review were this a new statute, see *Harrison* v. *N. A. A. C. P., supra,* the State here is enabled to maintain at least some substantial measure of compliance with

this statute and still obviate any review in this Court, by the device of purely discretionary prosecutorial inactivity. It seems to me to destroy the whole purpose of anticipatory relief to consider the prosecutor's discretion, once all legal and administrative channels have been cleared, as in any way analogous to those other contingencies which make remote a controversy presenting Constitutional claims.

In this light it is not surprising that the Court's position is without support in the precedents.[11] Indeed it seems to me that *Pierce* v. *Society of Sisters,* 268 U. S. 510, provides very clear authority contrary to the position of the Court in this case, for there a Court which included Justices Holmes, Brandeis, and Stone rejected a claim of prematureness and then passed upon and held unconstitutional a state statute whose sanctions were not even to become effective for more than seventeen months after the time the case was argued to this Court. The Court found allegations of present loss of business, caused by the threat of the statute's future enforcement against the Society's clientele, sufficient to make the injury to the Society "present and very real." 268 U. S., at 536. I cannot regard as less present, or less real, the tendency to discourage the exercise of the liberties of these appellants, caused by reluctance to submit their freedoms from prose-

---

[11] There is a much discredited dictum in *Ex parte La Prade,* 289 U. S. 444, that in an injunction action there must be an allegation of threatened immediate enforcement of the statute. See 50 Yale L. J. 1278; Borchard, Challenging "Penal" Statutes by Declaratory Action, 52 Yale L. J. 445; 62 Harv. L. Rev. 870–871. But against this dictum (which even in its context was justified only as a natural consequence of the rule of *Ex parte Young,* 209 U. S. 123, involving suits against state officers) one can array numerous cases in which proof of any such immediate threat was considered unnecessary and the Court proceeded to a determination of the merits. See, *e. g., Pennsylvania* v. *West Virginia,* 262 U. S. 553; *Euclid* v. *Ambler Co.,* 272 U. S. 365; *Carter* v. *Carter Coal Co.,* 298 U. S. 238; *Currin* v. *Wallace,* 306 U. S. 1.

cution and conviction to the discretion of the Connecticut prosecuting authorities. I therefore think it incumbent on us to consider the merits of appellants' Constitutional claims.

## PART TWO.

### Constitutionality.

I consider that this Connecticut legislation, as construed to apply to these appellants, violates the Fourteenth Amendment. I believe that a statute making it a criminal offense for *married couples* to use contraceptives is an intolerable and unjustifiable invasion of privacy in the conduct of the most intimate concerns of an individual's personal life. I reach this conclusion, even though I find it difficult and unnecessary at this juncture to accept appellants' other argument that the judgment of policy behind the statute, so applied, is so arbitrary and unreasonable as to render the enactment invalid for that reason alone. Since both the contentions draw their basis from no explicit language of the Constitution, and have yet to find expression in any decision of this Court, I feel it desirable at the outset to state the framework of Constitutional principles in which I think the issue must be judged.

### I.

In reviewing state legislation, whether considered to be in the exercise of the State's police powers, or in provision for the health, safety, morals or welfare of its people, it is clear that what is concerned are "the powers of government inherent in every sovereignty." *The License Cases*, 5 How. 504, 583. Only to the extent that the Constitution so requires may this Court interfere with the exercise of this plenary power of government. *Barron* v. *Mayor of Baltimore*, 7 Pet. 243. But precisely because it is the Constitution alone which warrants judicial interference in sovereign operations of the State,

the basis of judgment as to the Constitutionality of state action must be a rational one, approaching the text which is the only commission for our power not in a literalistic way, as if we had a tax statute before us, but as the basic charter of our society, setting out in spare but meaningful terms the principles of government. *McCulloch* v. *Maryland,* 4 Wheat. 316. But as inescapable as is the rational process in Constitutional adjudication in general, nowhere is it more so than in giving meaning to the prohibitions of the Fourteenth Amendment and, where the Federal Government is involved, the Fifth Amendment, against the deprivation of life, liberty or property without due process of law.

It is but a truism to say that this provision of both Amendments is not self-explanatory. As to the Fourteenth, which is involved here, the history of the Amendment also sheds little light on the meaning of the provision. Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights, 2 Stan. L. Rev. 15. It is important to note, however, that two views of the Amendment have not been accepted by this Court as delineating its scope. One view, which was ably and insistently argued in response to what were felt to be abuses by this Court of its reviewing power, sought to limit the provision to a guarantee of procedural fairness. See *Davidson* v. *New Orleans,* 96 U. S. 97, 105; Brandeis, J., in *Whitney* v. *California,* 274 U. S. 357, at 373; Warren, The New "Liberty" under the 14th Amendment, 39 Harv. L. Rev. 431; Reeder, The Due Process Clauses and "The Substance of Individual Rights," 58 U. Pa. L. Rev. 191; Shattuck, The True Meaning of The Term "Liberty" in Those Clauses in the Federal and State Constitutions Which Protect "Life, Liberty, and Property," 4 Harv. L. Rev. 365. The other view which has been rejected would have it that the Fourteenth Amendment, whether by way of the Privileges and Immunities Clause or the Due

Process Clause, applied against the States only and precisely those restraints which had prior to the Amendment been applicable merely to federal action. However, "due process" in the consistent view of this Court has ever been a broader concept than the first view and more flexible than the second.

Were due process merely a procedural safeguard it would fail to reach those situations where the deprivation of life, liberty or property was accomplished by legislation which by operating in the future could, given even the fairest possible procedure in application to individuals, nevertheless destroy the enjoyment of all three. Compare, *e. g., Selective Draft Law Cases,* 245 U. S. 366; *Butler* v. *Perry,* 240 U. S. 328; *Korematsu* v. *United States,* 323 U. S. 214. Thus the guaranties of due process, though having their roots in Magna Carta's *"per legem terrae"* and considered as procedural safeguards "against executive usurpation and tyranny," have in this country "become bulwarks also against arbitrary legislation." *Hurtado* v. *California,* 110 U. S. 516, at 532.

However it is not the particular enumeration of rights in the first eight Amendments which spells out the reach of Fourteenth Amendment due process, but rather, as was suggested in another context long before the adoption of that Amendment, those concepts which are considered to embrace those rights "which are . . . *fundamental;* which belong . . . to the citizens of all free governments," *Corfield* v. *Coryell,* 4 Wash. C. C. 371, 380, for "the purposes [of securing] which men enter into society," *Calder* v. *Bull,* 3 Dall. 386, 388. Again and again this Court has resisted the notion that the Fourteenth Amendment is no more than a shorthand reference to what is explicitly set out elsewhere in the Bill of Rights. *Slaughter-House Cases,* 16 Wall. 36; *Walker* v. *Sauvinet,* 92 U. S. 90; *Hurtado* v. *California,* 110 U. S. 516; *Presser* v. *Illinois,* 116 U. S. 252; *In re Kemmler,* 136 U. S. 436;

*Twining* v. *New Jersey,* 211 U. S. 78; *Palko* v. *Connecticut,* 302 U. S. 319. Indeed the fact that an identical provision limiting federal action is found among the first eight Amendments, applying to the Federal Government, suggests that due process is a discrete concept which subsists as an independent guaranty of liberty and procedural fairness, more general and inclusive than the specific prohibitions. See *Mormon Church* v. *United States,* 136 U. S. 1; *Downes* v. *Bidwell,* 182 U. S. 244; *Hawaii* v. *Mankichi,* 190 U. S. 197; *Balzac* v. *Porto Rico,* 258 U. S. 298; *Farrington* v. *Tokushige,* 273 U. S. 284; *Bolling* v. *Sharpe,* 347 U. S. 497.

Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint.

It is this outlook which has led the Court continuingly to perceive distinctions in the imperative character of Constitutional provisions, since that character must be discerned from a particular provision's larger context. And inasmuch as this context is one not of words, but of

history and purposes, the full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, see *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Holden* v. *Hardy,* 169 U. S. 366; *Booth* v. *Illinois,* 184 U. S. 425; *Nebbia* v. *New York,* 291 U. S. 502; *Skinner* v. *Oklahoma,* 316 U. S. 535, 544 (concurring opinion); *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment. Cf. *Skinner* v. *Oklahoma, supra; Bolling* v. *Sharpe, supra.*

As was said in *Meyer* v. *Nebraska,* 262 U. S. 390, 399, "this Court has not attempted to define with exactness the liberty thus guaranteed . . . . Without doubt, it denotes not merely freedom from bodily restraint . . . ." Thus, for instance, when in that case and in *Pierce* v. *Society of Sisters,* 268 U. S. 510, the Court struck down laws which sought not to require what children must learn in schools, but to prescribe, in the first case, what they must *not* learn, and in the second, *where* they must acquire their learning, I do not think it was wrong to put those decisions on "the right of the individual to . . . establish a home and bring up children," *Meyer* v. *Nebraska, ibid.,* or on the basis that "The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruc-

tion from public teachers only," *Pierce* v. *Society of Sisters,* at 535. I consider this so, even though today those decisions would probably have gone by reference to the concepts of freedom of expression and conscience assured against state action by the Fourteenth Amendment, concepts that are derived from the explicit guarantees of the First Amendment against federal encroachment upon freedom of speech and belief. See *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, and 656 (dissenting opinion); *Prince* v. *Massachusetts,* 321 U. S. 158, 166. For it is the purposes of those guarantees and not their text, the reasons for their statement by the Framers and not the statement itself, see *Palko* v. *Connecticut,* 302 U. S. 319, 324–327; *United States* v. *Carolene Prods.,* 304 U. S. 144, 152–153, which have led to their present status in the compendious notion of "liberty" embraced in the Fourteenth Amendment.

Each new claim to Constitutional protection must be considered against a background of Constitutional purposes, as they have been rationally perceived and historically developed. Though we exercise limited and sharply restrained judgment, yet there is no "mechanical yardstick," no "mechanical answer." The decision of an apparently novel claim must depend on grounds which follow closely on well-accepted principles and criteria. The new decision must take "its place in relation to what went before and further [cut] a channel for what is to come." *Irvine* v. *California,* 347 U. S. 128, 147 (dissenting opinion). The matter was well put in *Rochin* v. *California,* 342 U. S. 165, 170–171:

> "The vague contours of the Due Process Clause do not leave judges at large. We may not draw on our merely personal and private notions and disregard the limits that bind judges in their judicial function. Even though the concept of due process of law is not final and fixed, these limits are derived from con-

siderations that are fused in the whole nature of our judicial process . . . . These are considerations deeply rooted in reason and in the compelling traditions of the legal profession."

On these premises I turn to the particular Constitutional claim in this case.

## II.

Appellants contend that the Connecticut statute deprives them, as it unquestionably does, of a substantial measure of liberty in carrying on the most intimate of all personal relationships, and that it does so arbitrarily and without any rational, justifying purpose. The State, on the other hand, asserts that it is acting to protect the moral welfare of its citizenry, both directly, in that it considers the practice of contraception immoral in itself, and instrumentally, in that the availability of contraceptive materials tends to minimize "the disastrous consequence of dissolute action," that is fornication and adultery.

It is argued by appellants that the judgment, implicit in this statute—that the use of contraceptives by married couples is immoral—is an irrational one, that in effect it subjects them in a very important matter to the arbitrary whim of the legislature, and that it does so for no good purpose. Where, as here, we are dealing with what must be considered "a basic liberty," cf. *Skinner* v. *Oklahoma, supra,* at 541, "There are limits to the extent to which the presumption of constitutionality can be pressed," *id.,* at 544 (concurring opinion), and the mere assertion that the action of the State finds justification in the controversial realm of morals cannot justify alone any and every restriction it imposes. See *Alberts* v. *California,* 354 U. S. 476.

Yet the very inclusion of the category of morality among state concerns indicates that society is not limited in its objects only to the physical well-being of the com-

munity, but has traditionally concerned itself with the moral soundness of its people as well. Indeed to attempt a line between public behavior and that which is purely consensual or solitary would be to withdraw from community concern a range of subjects with which every society in civilized times has found it necessary to deal. The laws regarding marriage which provide both when the sexual powers may be used and the legal and societal context in which children are born and brought up, as well as laws forbidding adultery, fornication and homosexual practices which express the negative of the proposition, confining sexuality to lawful marriage, form a pattern so deeply pressed into the substance of our social life that any Constitutional doctrine in this area must build upon that basis. Compare *McGowan* v. *Maryland,* 366 U. S. 420.

It is in this area of sexual morality, which contains many proscriptions of consensual behavior having little or no direct impact on others, that the State of Connecticut has expressed its moral judgment that all use of contraceptives is improper. Appellants cite an impressive list of authorities who, from a great variety of points of view, commend the considered use of contraceptives by married couples. What they do not emphasize is that not too long ago the current of opinion was very probably quite the opposite,[12] and that even today the issue is not

---

[12] The so-called Comstock Law, 17 Stat. 598, may be regarded as characteristic of the attitude of a large segment of public opinion on this matter through the end of the last century. It was only by judicial interpretation at a later date that the absolute prohibitions of the law were qualified to exclude professional medical use. *Youngs Rubber Corp.* v. *Lee & Co.,* 45 F. 2d 103; *Davis* v. *United States,* 62 F. 2d 473; *United States* v. *One Package,* 86 F. 2d 737; 50 Harv. L. Rev. 1312. However, the Comstock Law in its original form "started a fashion" and many States enacted similar legislation, some of which is still on the books. See Stone and Pilpel, The Social and Legal Status of Contraception, 22 N. C. L. Rev. 212; Legislation Note,

free of controversy. Certainly, Connecticut's judgment is no more demonstrably correct or incorrect than are the varieties of judgment, expressed in law, on marriage and divorce, on adult consensual homosexuality, abortion, and sterilization, or euthanasia and suicide. If we had a case before us which required us to decide simply, and in abstraction, whether the moral judgment implicit in the application of the present statute to married couples was a sound one, the very controversial nature of these questions would, I think, require us to hesitate long before concluding that the Constitution precluded Connecticut from choosing as it has among these various views. Cf. *Alberts* v. *California,* 354 U. S. 476, 500–503 (concurring opinion).

But, as might be expected, we are not presented simply with this moral judgment to be passed on as an abstract proposition. The secular state is not an examiner of consciences: it must operate in the realm of behavior, of overt actions, and where it does so operate, not only the underlying, moral purpose of its operations, but also the *choice of means* becomes relevant to any Constitutional judgment on what is done. The moral presupposition on which appellants ask us to pass judgment could form the basis of a variety of legal rules and administrative choices, each presenting a different issue for adjudication. For example, one practical expression of the moral view propounded here might be the rule that a marriage in which

45 Harv. L. Rev. 723; Note, 6 U. of Chi. L. Rev. 260; Murray, America's Four Conspiracies, at 32–33, in Religion in America (Cogley ed.). Indeed the criticism of these measures assumes that they represented general public opinion, though of a bygone day. See, *e. g.,* Knopf, Various Aspects of Birth Control; Birth Control Clinical Research Bureau, Laws Relating to Birth Control in the United States and its Territories, foreword and introduction; Stone and Pilpel, *supra;* Hearings on H. R. 11082, 72d Cong., 1st Sess. See generally, Broun and Leech, Anthony Comstock; Dennett, Birth Control Laws.

only contraceptive relations had taken place had never been consummated and could be annulled. Compare, *e. g.,* 2 Bouscaren, Canon Law Digest, 307–313. Again, the use of contraceptives might be made a ground for divorce, or perhaps tax benefits and subsidies could be provided for large families. Other examples also readily suggest themselves.

### III.

Precisely what is involved here is this: the State is asserting the right to enforce its moral judgment by intruding upon the most intimate details of the marital relation with the full power of the criminal law. Potentially, this could allow the deployment of all the incidental machinery of the criminal law, arrests, searches and seizures; inevitably, it must mean at the very least the lodging of criminal charges, a public trial, and testimony as to the *corpus delicti.* Nor could any imaginable elaboration of presumptions, testimonial privileges, or other safeguards, alleviate the necessity for testimony as to the mode and manner of the married couples' sexual relations, or at least the opportunity for the accused to make denial of the charges. In sum, the statute allows the State to enquire into, prove and punish married people for the private use of their marital intimacy.

This, then, is the precise character of the enactment whose Constitutional measure we must take. The statute must pass a more rigorous Constitutional test than that going merely to the plausibility of its underlying rationale. See pp. 542–545, *supra.* This enactment involves what, by common understanding throughout the English-speaking world, must be granted to be a most fundamental aspect of "liberty," the privacy of the home in its most basic sense, and it is this which requires that the statute be subjected to "strict scrutiny." *Skinner* v. *Oklahoma, supra,* at 541.

That aspect of liberty which embraces the concept of the privacy of the home receives explicit Constitutional protection at two places only. These are the Third Amendment, relating to the quartering of soldiers,[13] and the Fourth Amendment, prohibiting unreasonable searches and seizures.[14] While these Amendments reach only the Federal Government, this Court has held in the strongest terms, and today again confirms, that the concept of "privacy" embodied in the Fourth Amendment is part of the "ordered liberty" assured against state action by the Fourteenth Amendment. See *Wolf* v. *Colorado,* 338 U. S. 25; *Mapp* v. *Ohio, post,* p. 643.

It is clear, of course, that this Connecticut statute does not invade the privacy of the home in the usual sense, since the invasion involved here may, and doubtless usually would, be accomplished without any physical intrusion whatever into the home. What the statute undertakes to do, however, is to create a crime which is grossly offensive to this privacy, while the Constitution refers only to methods of ferreting out substantive wrongs, and the procedure it requires presupposes that substantive offenses may be committed and sought out in the privacy of the home. But such an analysis forecloses any claim to Constitutional protection against this form of deprivation of privacy, only if due process in this respect is limited to what is explicitly provided in the Constitution, divorced from the rational purposes, historical roots, and subsequent developments of the relevant provisions.

---

[13] "No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."

[14] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Perhaps the most comprehensive statement of the principle of liberty underlying these aspects of the Constitution was given by Mr. Justice Brandeis, dissenting in *Olmstead* v. *United States,* 277 U. S. 438, at 478:

"The protection guaranteed by the [Fourth and Fifth] Amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone— the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. . . ."

I think the sweep of the Court's decisions, under both the Fourth and Fourteenth Amendments, amply shows that the Constitution protects the privacy of the home against all unreasonable intrusion of whatever character. "[These] principles . . . affect the very essence of constitutional liberty and security. They reach farther than [a] concrete form of the case . . . before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of life. . . ." *Boyd* v. *United States,* 116 U. S. 616, 630. "The security of one's privacy against arbitrary intrusion by the police— which is at the core of the Fourth Amendment—is basic to a free society." *Wolf* v. *Colorado, supra,* at 27. In addition, see, *e. g., Davis* v. *United States,* 328 U. S. 582, 587;

*Oklahoma Press Pub. Co.* v. *Walling,* 327 U. S. 186, 202–203; *Frank* v. *Maryland,* 359 U. S. 360, 365–366; *Silverman* v. *United States,* 365 U. S. 505, 511.

It would surely be an extreme instance of sacrificing substance to form were it to be held that the Constitutional principle of privacy against arbitrary official intrusion comprehends only physical invasions by the police. To be sure, the times presented the Framers with two particular threats to that principle, the general warrant, see *Boyd* v. *United States, supra,* and the quartering of soldiers in private homes. But though "Legislation, both statutory and constitutional, is enacted, . . . from an experience of evils, . . . its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. . . . [A] principle to be vital must be capable of wider application than the mischief which gave it birth." *Weems* v. *United States,* 217 U. S. 349, 373.

Although the form of intrusion here—the enactment of a substantive offense—does not, in my opinion, preclude the making of a claim based on the right of privacy embraced in the "liberty" of the Due Process Clause, it must be acknowledged that there is another sense in which it could be argued that this intrusion on privacy differs from what the Fourth Amendment, and the similar concept of the Fourteenth, were intended to protect: here we have not an intrusion into the home so much as on the life which characteristically has its place in the home. But to my mind such a distinction is so insubstantial as to be captious: if the physical curtilage of the home is protected, it is surely as a result of solicitude to protect the privacies of the life within. Certainly the safeguarding of the home does not follow merely from the sanctity of property rights. The home derives its pre-eminence as the seat of family life. And the integrity of that life is something so fundamental that it has been found to draw

to its protection the principles of more than one explicitly granted Constitutional right. Thus, Mr. Justice Brandeis, writing of a statute which made "it punishable to teach [pacifism] in any place [to] a single person . . . no matter what the relation of the parties may be," found such a "statute invades the privacy and freedom of the home. Father and mother may not follow the promptings of religious belief, of conscience or of conviction, and teach son or daughter the doctrine of pacifism. If they do any police officer may summarily arrest them." *Gilbert* v. *Minnesota,* 254 U. S. 325, 335–336 (dissenting opinion). This same principle is expressed in the *Pierce* and *Meyer* cases, *supra.* These decisions, as was said in *Prince* v. *Massachusetts,* 321 U. S. 158, at 166, "have respected the private realm of family life which the state cannot enter."

Of this whole "private realm of family life" it is difficult to imagine what is more private or more intimate than a husband and wife's marital relations. We would indeed be straining at a gnat and swallowing a camel were we to show concern for the niceties of property law involved in our recent decision, under the Fourth Amendment, in *Chapman* v. *United States,* 365 U. S. 610, and yet fail at least to see any substantial claim here.

Of course, just as the requirement of a warrant is not inflexible in carrying out searches and seizures, see *Abel* v. *United States,* 362 U. S. 217; *United States* v. *Rabinowitz,* 339 U. S. 56, so there are countervailing considerations at this more fundamental aspect of the right involved. "[T]he family . . . is not beyond regulation," *Prince* v. *Massachusetts, supra,* and it would be an absurdity to suggest either that offenses may not be committed in the bosom of the family or that the home can be made a sanctuary for crime. The right of privacy most manifestly is not an absolute. Thus, I would not suggest that adultery, homosexuality, fornication and incest are immune from criminal enquiry, however privately practiced. So much

has been explicitly recognized in acknowledging the State's rightful concern for its people's moral welfare. See pp. 545–548, *supra*. But not to discriminate between what is involved in this case and either the traditional offenses against good morals or crimes which, though they may be committed anywhere, happen to have been committed or concealed in the home, would entirely misconceive the argument that is being made.

Adultery, homosexuality and the like are sexual intimacies which the State forbids altogether, but the intimacy of husband and wife is necessarily an essential and accepted feature of the institution of marriage, an institution which the State not only must allow, but which always and in every age it has fostered and protected. It is one thing when the State exerts its power either to forbid extra-marital sexuality altogether, or to say who may marry, but it is quite another when, having acknowledged a marriage and the intimacies inherent in it, it undertakes to regulate by means of the criminal law the details of that intimacy.

In sum, even though the State has determined that the use of contraceptives is as iniquitous as any act of extra-marital sexual immorality, the intrusion of the whole machinery of the criminal law into the very heart of marital privacy, requiring husband and wife to render account before a criminal tribunal of their uses of that intimacy, is surely a very different thing indeed from punishing those who establish intimacies which the law has always forbidden and which can have no claim to social protection.

In my view the appellants have presented a very pressing claim for Constitutional protection. Such difficulty as the claim presents lies only in evaluating it against the State's countervailing contention that it be allowed to enforce, by whatever means it deems appropriate, its judgment of the immorality of the practice this law con-

demns. In resolving this conflict a number of factors compel me to conclude that the decision here must most emphatically be for the appellants. Since, as it appears to me, the statute marks an abridgment of important fundamental liberties protected by the Fourteenth Amendment, it will not do to urge in justification of that abridgment simply that the statute is rationally related to the effectuation of a proper state purpose. A closer scrutiny and stronger justification than that are required. See pp. 542–545, *supra*.

Though the State has argued the Constitutional permissibility of the moral judgment underlying this statute, neither its brief, nor its argument, nor anything in any of the opinions of its highest court in these or other cases even remotely suggests a justification for the obnoxiously intrusive means it has chosen to effectuate that policy. To me the very circumstance that Connecticut has not chosen to press the enforcement of this statute against individual users, while it nevertheless persists in asserting its right to do so at any time—in effect a right to hold this statute as an imminent threat to the privacy of the households of the State—conduces to the inference either that it does not consider the policy of the statute a very important one, or that it does not regard the means it has chosen for its effectuation as appropriate or necessary.

But conclusive, in my view, is the utter novelty of this enactment. Although the Federal Government and many States have at one time or other had on their books statutes forbidding or regulating the distribution of contraceptives, none, so far as I can find, has made the *use* of contraceptives a crime.[15] Indeed, a diligent search has

---

[15] See tabulation of statutes in Birth Control Legislation, 9 Cleveland-Marshall Law Review, 245 (1960); Legislation Note, 45 Harv. L. Rev. 723 (1932); Birth Control Clinical Research Bureau, Laws Relating to Birth Control in the United States and its Territories (1938).

revealed that no nation, including several which quite evidently share Connecticut's moral policy,[16] has seen fit to effectuate that policy by the means presented here.

Though undoubtedly the States are and should be left free to reflect a wide variety of policies, and should be allowed broad scope in experimenting with various means of promoting those policies, I must agree with Mr. Justice Jackson that "There are limits to the extent to which a legislatively represented majority may conduct . . . experiments at the expense of the dignity and personality" of the individual. *Skinner* v. *Oklahoma, supra.* In this instance these limits are, in my view, reached and passed.

I would adjudicate these appeals and hold this statute unconstitutional, insofar as it purports to make criminal the conduct contemplated by these married women. It follows that if their conduct cannot be a crime, appellant Buxton cannot be an accomplice thereto. I would reverse the judgment in each of these cases.

MR. JUSTICE STEWART, dissenting.

For the reasons so convincingly advanced by both MR. JUSTICE DOUGLAS and MR. JUSTICE HARLAN, I join them in dissenting from the dismissal of these appeals. Since the appeals are nonetheless dismissed, my dissent need go no further. However, in refraining from a discussion of the constitutional issues, I in no way imply that the ultimate result I would reach on the merits of these controversies would differ from the conclusions of my dissenting Brothers.

---

[16] Unqualified disapproval of contraception is implicit in the laws of Belgium, Droit Penal, § 383; France, Code Penal, Art. 317; Ireland, Censorship of Publications Act of 1929, §§ 16, 17, Criminal Law Amendment Act of 1935, § 17; Italy, Codice Penale, Arts. 553, 555; and Spain, Codigo Penal, Art. 416. Compare the more permissive legislation in Canada, Criminal Code, § 150; Germany, Strafgesetzbuch, § 184; and Switzerland, Code Penal, Art. 211.