728 S.E.2d 455

**The STATE, Respondent,**

v.

**Jennifer Rayanne DYKES, Appellant.**

**No. 27124.**

Supreme Court of South Carolina.

Heard Sept. 22, 2011.

Decided May 9, 2012.

Christopher D. Scalzo, Greenville County Public Defender's Office, of Greenville, and Deputy Chief Appellate Defender Wanda H. Carter, of South Carolina Commission on Indigent Defense, of Columbia, for Appellant.

Assistant Deputy Director J. Benjamin Aplin, and Legal Counsel Tommy Evans, Jr., of South Carolina Department of Probation, Parole, and Pardon Services, both of Columbia, for Respondent.

Justice HEARN.[1]

Jennifer Rayanne Dykes appeals the circuit court's order that she be subject to satellite monitoring for the rest of her natural life pursuant to Section 23–3–540(C) of the South Carolina Code (Supp.2010). She lodges five constitutional challenges to this statute: it violates her substantive due process rights, her right to procedural due process, the Ex Post Facto clause, the Equal Protection Clause, and her right to be free from unreasonable searches and seizures. We hold the mandatory imposition of lifetime satellite monitoring vio-

---

1. Because a majority of the Court has joined the separate concurring opinion of Justice Kittredge, his concurrence is now the controlling opinion in this case.

lates Dykes' substantive due process rights and reverse and remand for further proceedings.

## FACTUAL/PROCEDURAL BACKGROUND

Dykes was indicted for lewd act on a child under the age of sixteen in violation of Section 16–15–140 of the South Carolina Code (2003) as a result of her relationship with a fourteen-year-old girl while Dykes was twenty-six years old. The two met when Dykes was working at a local discount store and developed an eight month relationship. Dykes ultimately pled guilty to lewd act and was sentenced to fifteen years' imprisonment, suspended upon the service of three years and five years' probation. Because her offense predated the satellite monitoring statute, she was not subject to monitoring at the time of her plea.

Prior to her release from prison, Dykes was evaluated pursuant to the Sexually Violent Predator Act and found not to meet the definition of a sexually violent predator. Accordingly, no civil commitment proceedings were initiated, and she was released on probation. At the time of her release, she was notified verbally and in writing that pursuant to section 23–3–540(C) she would be placed on satellite monitoring if she were to violate the terms of her probation.

Soon after Dykes' release, five citations and arrest warrants were issued to her for various probation violations: a citation pertaining to her relationship with a convicted felon whom Dykes met while incarcerated and with whom she was then residing; an arrest warrant for Dykes' continued relationship with that individual; a citation for drinking an alcoholic beverage; a citation for being terminated from sex offender counseling after she cancelled or rescheduled too many appointments; and an arrest warrant for failing to maintain an approved residence and changing her address without the knowledge or consent of her probation agent. Dykes did not contest any of these violations, but she did offer a context to each one in mitigation.

The State recommended a two-year partial revocation of Dykes' probation and mandatory life-time satellite monitoring. When an individual has been convicted of engaging in or attempting criminal sexual conduct with a minor in the first

degree (CSC–First)[2] or lewd act, the court must order that person placed on satellite monitoring. S.C.Code Ann. § 23–3–540(A). Likewise, if a person has been convicted of those offenses before the effective date of the statute and violates a term of his probation, parole, or supervision program, he too must be placed on satellite monitoring. *See id.* § 23–3–540(C). Once activated, the monitor can pinpoint the individual's location to within fifteen meters. The individual must remain on monitoring for as long as he is to remain on the sex offender registry, *id.* § 23–3–540(H), which is for life, *id.* § 23–3–460. There is no statutory mechanism to petition the court for relief from this lifetime monitoring.

In contrast, if a person is convicted of committing or attempting any of the following offenses, or was previously convicted of one and violates a term of his probation, parole, or supervision, the court has discretion[3] with respect to whether the individual should be placed on satellite monitoring: criminal sexual conduct with a minor in the second degree; engaging a child for sexual performance; producing, directing, or promoting sexual performance by a child; assaults with intent to commit criminal sexual conduct involving a minor; violation of the laws concerning obscenity, material harmful to minors, child exploitation, and child prostitution; kidnapping of a person under the age of eighteen unless the defendant is a parent; and trafficking in persons under the age of eighteen if the offense includes a completed or attempted criminal sexual offense. *Id.* § 23–3–540(B), (D), (G)(1).

After ten years, an individual who has committed the above-stated crimes may petition the court to have the monitoring removed upon a showing by clear and convincing evidence that he has complied with the monitoring requirements and there is no longer a need to continue monitoring him. *Id.* § 23–3–540(H). If the court denies his petition, he may petition again every five years. *Id.* As long as the individual is being

---

2. Specifically, the individual must have engaged in a sexual battery with a victim who is less than eleven years old. S.C.Code Ann. § 23–3–540(A) (Supp.2010) (cross-referencing *id.* § 16–3–655(A)(1) (Supp. 2010)).

3. The statute does not provide any criteria to aid the court in determining whether to order monitoring for these individuals.

monitored, he must comply with all the terms set by the State, report damage to the device, pay for the costs of the monitoring (unless he can show severe hardship), and not remove or tamper with the device; failure to follow these rules may result in criminal penalties. *Id.* §§ 23–3–540(I) to (L).

Furthermore, the satellite monitoring program places restrictions on the subject's movements as well. In response to a question from the bench during oral argument concerning Dykes' ability to travel outside the State of South Carolina while wearing the device, counsel for the Department of Probation, Parole, and Pardon Services-who appeared on behalf of the State-represented that out-of-state travel was not restricted. However, following oral argument, counsel corrected this error in a letter to this Court stating that the department's policy for monitoring "restricts travel outside the State of South Carolina unless there is approval by the supervising agent. This plan will not allow for overnight travel except in the case of an emergency, and must be approved by the Regional Director." Thus, a person subject to satellite monitoring may not leave the State without prior approval and may only be gone overnight in the case of an emergency. For Dykes, this restriction on her right to travel freely in this country would, pursuant to the policy, extend throughout her life, without any possibility of petitioning the court for relief.

At her probation revocation hearing, Dykes objected to the constitutionality of mandatory lifetime monitoring. In support of her arguments, Dykes presented expert testimony that she personally poses a low risk of reoffending and that one's risk of reoffending cannot be determined solely by the offense committed. Thus, the core of Dykes' constitutional challenge is that the State cannot monitor someone who poses a low risk of reoffending. Dykes' expert, however, did acknowledge that there is at least some risk that everyone will reoffend.

The circuit court found Dykes to be in willful violation of her probation and that she had notice of the potential for satellite monitoring. While the court clearly was troubled by the scope and breadth of section 23–3–540(C), it denied Dykes' constitutional challenges and found it was statutorily mandated to impose satellite monitoring without making any findings as to

Dykes' likelihood of reoffending. The court also revoked Dykes' probation for two years, but it ordered that her probation be terminated upon release. This appeal followed.

## LAW/ANALYSIS

Dykes argues that requiring she submit herself to lifetime satellite monitoring when she poses a low risk of reoffending violates her substantive due process rights under the Fourteenth Amendment to the United States Constitution. We agree.

"[A]ll statutes are presumed constitutional and, if possible, will be construed to render them valid." *Curtis v. State*, 345 S.C. 557, 569, 549 S.E.2d 591, 597 (2001). Accordingly, we will not find a statute unconstitutional unless "its repugnance to the Constitution is clear and beyond a reasonable doubt." *Id.* at 570, 549 S.E.2d at 597. The party challenging the validity of a statute bears the burden of proving it is unconstitutional. *See Knotts v. S.C. Dep't of Natural Res.*, 348 S.C. 1, 6, 558 S.E.2d 511, 513 (2002).

The Constitution's provision that "[n]o state shall ... deprive any person of life, liberty, or property without due process of law," U.S. Const. amend. XIV, § 1, guarantees more than just fair process; it "cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them,'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). The core of the Due Process Clause, therefore, is the protection against arbitrary governmental action. *Id.* at 845, 118 S.Ct. 1708. Substantive due process in particular protects against the arbitrary infringement of "fundamental rights that are so 'implicit in the concept of ordered liberty' that 'neither liberty nor justice would exist if they were sacrificed.'" *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir.2005) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325–26, 58 S.Ct. 149, 82 L.Ed. 288 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969)).

However, one does not have a general liberty interest simply in being free from arbitrary and capricious government

action. *Hawkins v. Freeman,* 195 F.3d 732, 749 (4th Cir.1999) (en banc). Rather, "the substantive component of the due process clause only protects from arbitrary government action that infringes a specific liberty interest." *Id.* If the interest infringed upon is a fundamental right, the statute must be "narrowly tailored to serve a compelling state interest." *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *see also In re Treatment and Care of Luckabaugh,* 351 S.C. 122, 140, 568 S.E.2d 338, 347 (2002). If the right is not a fundamental one, the statute is only subject to rational basis review. *Luckabaugh,* 351 S.C. at 140, 568 S.E.2d at 347. Dykes does not argue South Carolina's satellite monitoring scheme fails the lesser rational basis review, choosing instead to rely exclusively on strict scrutiny. Accordingly, we proceed only under this heightened review and must first determine whether the alleged right the statute infringes upon is fundamental.

Before analyzing the right argued by Dykes, we note that we must tread carefully in this arena. Over the years, the Supreme Court of the United States has expanded the liberty interest protected by the Due Process Clause beyond the specific freedoms contained in the Bill of Rights. *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (noting that the Supreme Court has found the right to marry, have children, direct the education of one's children, marital privacy, use contraception, retain bodily integrity, and receive an abortion are all protected). The Supreme Court, however, "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this uncharted area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Furthermore, when a court deems a right fundamental under the umbrella of substantive due process, it effectively removes the matter from discussion and legislative debate. *Glucksberg,* 521 U.S. at 720, 117 S.Ct. 2258. We must therefore "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." *Id.* (internal citations and quotations omitted).

Hence, the Due Process Clause only "protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *See id.* at 720–21, 117 S.Ct. 2258 (internal citations and quotations omitted). To guard against unwarranted expansions of protected liberty interests, we must give a "careful description" of the asserted right, using this country's history and traditions as "the crucial guideposts for responsible decisionmaking." *Id.* at 721, 117 S.Ct. 2258 (internal citations and quotations omitted). The Supreme Court's

> substantive-due-process jurisprudence ... has been a process whereby the outlines of the "liberty" specially protected by the Fourteenth Amendment-never fully clarified, to be sure, and perhaps not capable of being fully clarified-have at least been carefully refined by concrete examples involving fundamental rights found to be deeply rooted in our legal tradition. This approach tends to rein in the subjective elements that are necessarily present in due-process judicial review.

*Id.* at 722, 117 S.Ct. 2258. With that in mind, we turn to the right Dykes alleges has been infringed upon.

Dykes asserts that the State's continuous monitoring of her location violates her fundamental right "to be let alone." However, this broad statement is an "issue-begging generalization[ ] that cannot serve the inquiry" of delineating the precise contours of the asserted right. *See Hawkins,* 195 F.3d at 747. When viewed in light of the facts of this case and the authorities relied upon by Dykes, the narrow right on which she relies is the right of a convicted sex offender who has been released from prison and not serving a probationary term to be free from satellite monitoring for the rest of her life absent a demonstration that she is likely to reoffend.

Although Dykes has overstated the exact right on which she relies, traditional notions of liberty and the right to be let alone are instructive for they provide the context within which we must analyze Dykes' specific right. William Blackstone, in his landmark Commentaries on the Laws of England, noted that man is generally endowed with free will, but that freedom

is not absolute and each of us relinquishes some of it to be part of an organized society:

> The absolute rights of man, considered as a free agent, endowed with discernment to know good from evil, and with power of choosing those measures which appear to him to be most desirable, are usually summed up in one general appellation, and denominated the natural liberty of mankind. This natural liberty consists properly in a power of acting as one thinks fit, without any restraint or control, unless by the law of nature: being a right inherent in us by birth, and one of the gifts of God to man at his creation, when He endued him with the faculty of freewill. But every man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and, in consideration of receiving the advantages of mutual commerce, obliges himself to conform to those laws, which the community has thought proper to establish. And this species of legal obedience and conformity is infinitely more desirable, than that wild and savage liberty which is sacrificed to obtain it.

1 William Blackstone, Commentaries *121. Blackstone also found, however, that the government's right to restrict an individual's free will is not immutable:

> Political therefore, or civil, liberty, which is that of a member of society, is no other than natural liberty so far restrained by human laws (and no farther) as is necessary and expedient for the general advantage of the public. Hence we may collect that the law, which restrains a man from doing mischief to his fellow citizens, though it diminishes the natural, increases the civil liberty of mankind: but every wanton and causeless restraint on the will of the subject, whether practiced by a monarch, a nobility, or a popular assembly, is a degree of tyranny. Nay, that even laws themselves, whether made with or without our consent, if they regulate and constrain our conduct in matters of mere indifference, without any good end in view, are laws destructive of liberty[.] ... So that laws, when prudently framed, are by no means subversive but rather introductive of liberty; for (as Mr. Locke has well observed) where there is no law, there is no freedom. But then, on the other hand, that constitution or frame of government, that system of

laws, is alone calculated to maintain civil liberty, which leaves the subject entire master of his own conduct, except in those points wherein the public good requires some direction or restraint.

*Id.* at *121–22.

Thus, the concept of liberty as being unrestrained except as necessary to provide order in society is deeply rooted in the foundations of our common law system, and any further restriction would be tyranny. Indeed, Blackstone's commentary reflects our substantive due process milieu, where the core rights of freedom and liberty can only be limited when sufficiently necessary to advance the public good. Furthermore, various members of the Supreme Court have voiced their views that the government has a very limited ability to infringe on one's liberty. Louis Brandeis, before he became a Justice, wrote in a law review article,

[T]here came a recognition of man's spiritual nature, of his feelings and his intellect. Gradually the scope of these legal rights broadened; and now the right to life has come to mean the right to enjoy life, —the right to be let alone; the right to liberty secures the exercise of extensive civil privileges. . . .

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy,* 4 Harv. L.Rev. 193, 193 (1890). After he joined the Supreme Court, Justice Brandeis noted that the Founding Fathers

recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone-the most comprehensive of rights and the right most valued by civilized men.

*Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), *overruled in part by Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) *and Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

Not long thereafter, a majority of the Supreme Court stated,

> [T]he domain of liberty, withdrawn by the Fourteenth Amendment from encroachment by the states, has been enlarged by latter-day judgments to include liberty of the mind as well as liberty of action. The extension became, indeed, a logical imperative when it was recognized, as long ago as it was, that liberty is something more than exemption from physical restraint. . . .

*Palko*, 302 U.S. at 327, 58 S.Ct. 149.

Additionally, in an oft-quoted dissent in *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), Justice Harlan wrote,

> [T]he full scope of liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints.

*Id.* at 543, 81 S.Ct. 1752 (Harlan, J., dissenting).[4] These words "eloquently" describe the Court's role in the substantive due process inquiry. *Moore v. City of East Cleveland*, 431 U.S. 494, 501, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

In *Glucksberg*, however, the Supreme Court admonished overreliance on these vague and free-flowing concepts of liberty in the due process analysis. Although the Supreme Court has, in the past, relied in particular on Justice Harlan's dissent in *Poe* in its fundamental rights analysis, at no point has the Court jettisoned its "established approach" of searching for concrete examples of the claimed right in the Court's jurisprudence. *Glucksberg*, 521 U.S. at 721–22 & n. 17, 117 S.Ct. 2258. In the context of this case, the Court's reaffirmance of the historical approach to fundamental rights presents us with an

---

4. The majority in *Poe* did not reach the substantive issue involved because it found the case to be nonjusticiable. *Poe*, 367 U.S. at 507–09, 81 S.Ct. 1752.

interesting quandary. While we must search for historical examples of the claimed right in order to find it one deeply rooted in our legal tradition and therefore fundamental, the ability to track an individual's precise location is a relatively recent technological innovation without a historical antecedent.

Nevertheless, we believe the mere fact that something is a new invention does not preclude the finding that it implicates a fundamental right. Constitutional principles cannot be "entirely unaffected by the advance of technology," *Kyllo v. United States*, 533 U.S. 27, 33–34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), and courts must be able to incorporate new innovations into our existing constitutional framework.[5] *Glucksberg* strongly reminded courts to avoid a generous application of the Due Process Clause to state actions and insisted on a historical focus as a check. Here, however, there is no history for us to examine, not because the claimed right is not deeply rooted in our traditions, but instead because satellite monitoring is a new invention the Founding Fathers could not have envisioned. In the absence of a history to rely on in similar circumstances, the Court has resorted to examining more traditional notions of liberty. *Cf. Griswold v. Connecticut*, 381 U.S. 479, 482–86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (detailing general concepts of privacy under the Constitution and concluding that proscribing the use of contraception "is repulsive to the notions of privacy surrounding the marriage relationship"). At this point, a careful delineation of the exact nature of the claimed right serves to prevent the gratuitous expansion of fundamental rights. Thus, while we proceed without much history on which we can rest our analysis, narrowly defining the right Dykes argues has been infringed upon acts as the sort of check and guidepost the Court emphasized in *Glucksberg*.

---

5. As Chief Justice Roberts stated in 2006, "the impact of technology across the law" is going to be the biggest challenge for the Court in the coming years. Chief Justice John G. Roberts, Jr., Address at the Charleston School of Law (Oct. 20, 2006) (video recording on file in the Charleston School of Law Sol Blatt, Jr., Law Library). Especially with respect to constitutional rights, the Court is going to be confronted with "the impact of technology on areas of the law that we thought had been pretty well settled and established and are going to have to be revisited and rethought in the light of the new science." *Id.*

As we previously stated, the right at issue in this case is the right of a convicted sex offender who is not under any probationary or similar restrictions to be free from continuous satellite monitoring for life when she poses a low risk of reoffending. We begin first by examining the general impact of the satellite monitoring scheme. Recently, the Supreme Court had the opportunity to address a similar issue in *United States v. Jones*, — U.S. ——, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012), albeit in a different context. At issue in *Jones* was whether the government's surreptitious placement of a GPS tracking device on Jones's car without a warrant was an unconstitutional search. 132 S.Ct. at 947. The majority held that it was because the attachment of the monitor to the car was a physical trespass on personal property for the purpose of obtaining information. *Id.* at 947–49.

In his concurring opinion, Justice Alito tackled the thornier question of whether this satellite monitoring violated an individual's reasonable expectation of privacy. Justice Alito aptly observed that recent technological advancements have placed vast swaths of information into the public realm, a development which "will continue to shape the average person's expectations about the privacy of his or her daily movements." [6] *Id.* at 963–64 (Alito, J., concurring). With that in mind, he concluded monitoring one's movements on a public street for a relatively short period of time would not violate an individual's reasonable expectations of privacy. *Id.* (citing *United States v. Knotts*, 460 U.S. 276, 281–82, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983)). When that monitoring becomes long-term, however, the nature of the invasion changes:

> But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would-and indeed, in the main,

---

6. In *Jones*, the monitor placed on underside of Jones's car constantly tracked the car's movements over a four-week period without his knowledge. 132 S.Ct. at 947. The majority's contention to the contrary, Justice Alito noted there is no eighteenth century analogue to this type of investigation, because that "would have required either a gigantic coach, a very tiny constable, or both-not to mention a constable with incredible fortitude and patience." *Id.* at 958 n. 3 (Alito, J., concurring).

simply could not-secretly monitor and catalogue every single movement of an individual's car for a very long period. *Id.* Applying this principle to the four-week monitoring at issue in *Jones,* Justice Alito concluded, "We need not identify with precision the point at which the tracking of th[e] vehicle became a search, for the line was surely crossed before the 4–week mark." *Id.*

Justice Sotomayor similarly noted we live in an age so inundated with technology that we may unwittingly "reveal a great deal of information about [our]selves to third parties in the course of carrying out mundane tasks." *Id.* at 957 (Sotomayor, J., concurring). In that vein, she agreed with Justice Alito's concerns about the intrusiveness of satellite monitoring: "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." [7] *Id.* at 955–56. Thus, satellite monitoring invites the State into the subject's world twenty-four hours per day, seven days per week, and it provides the State with a precise view of her intimate habits, whether she is in public or not. If we are not careful about and cognizant of this fact, "the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse" and "may 'alter the relationship between citizen and government in a way that is inimical to democratic society.'" *Id.* (quoting *United States v. Cuevas–Perez,* 640 F.3d 272, 285 (7th Cir. 2011) (Flaum, J., concurring)).

Although these cases were decided under the rubric of the Fourth Amendment, we nevertheless find them instructive here. As Justice Alito and Justice Sotomayor incisively observed, the very concept of what we as citizens view as private is called into question by technology which facilities unprecedented oversight of our lives. More importantly, at issue in this case is not just the tracking of individuals for a period of time while they are being investigated for a specific crime-as

---

7. Justice Alito's concurrence was joined by three other members of the Court, Justice Ginsburg, Justice Breyer, and Justice Kagan. After noting she shared the same concerns as Justice Alito, Justice Sotomayor wrote that "[r]esolution of these difficult questions ... is unnecessary" at this time because the majority's trespass theory was dispositive of the case. *Jones,* 132 S.Ct. at 957 (Sotomayor, J., concurring).

with a Fourth Amendment search-but the statutorily mandated monitoring of certain individuals for as long as they live with no ability to have it removed. *See United States v. Pineda–Moreno*, 617 F.3d 1120, 1124 (9th Cir.2010) (Kozinski, J., dissenting from the denial of rehearing en banc) ("By holding that this kind of surveillance doesn't impair an individual's reasonable expectation of privacy, the panel hands the government the power to track the movements of every one of us, every day of our lives."). We must not forget that "liberty is something more than exemption from physical restraint" and includes a "liberty of the mind." *Palko*, 302 U.S. at 327, 58 S.Ct. 149. As our history from Blackstone to *Jones* accordingly makes clear, the Constitution guarantees a certain freedom from government intrusion into the day-to-day order of our lives which lies at the heart of a free society. In our opinion, "neither liberty nor justice would exist" if the government could, without sufficient justification, monitor the precise location of an individual twenty-four hours a day until he dies.

We turn next, as we must, to whether Dykes' status as a convicted sex offender alters this result. Although the concurrence believes it does, we disagree for the reasons below. The State first argues that satellite monitoring is akin to sex offender registration and is, indeed, less intrusive than registration. Numerous courts, including this Court, have routinely held that convicted sex offenders do not have a fundamental liberty interest to be free from registration requirements. *E.g., Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 500 (6th Cir.2007); *Doe v. Tandeske*, 361 F.3d 594, 597 (9th Cir.2004); *Ark. Dep't of Corr. v. Bailey*, 368 Ark. 518, 247 S.W.3d 851, 861 (2007); *State v. Germane*, 971 A.2d 555, 584 (R.I.2009); *Hendrix v. Taylor*, 353 S.C. 542, 552, 579 S.E.2d 320, 325 (2003); *McCabe v. Commonwealth*, 274 Va. 558, 650 S.E.2d 508, 512 (2007). However, a requirement that a person register is qualitatively different than a requirement that a person submit to mandatory satellite monitoring of his location for the rest of his life. The State argues that the inverse is true and that it is the sex offender registry which is more invasive. In particular, the State points out that the registry provides the public with the offender's full name, address, and offense history. Furthermore, the registry contains a photograph of the individual in addition to a physical description, complete

with a list of tattoos and scars. In contrast, information obtained through satellite monitoring of that individual is limited to only the person's location and is not available to the public.

While all of this may be true, the State misapprehends the thrust of Dykes' argument. She does not contend public availability of the information implicates a fundamental right, but rather that citizens have a right to be free from state monitoring of their every movement. This sort of constant surveillance reveals the intimate details of her private life by compiling a complete picture of her movements in public and in private that tells the story of how she lives her life, information not available through the registry. It is this invasion of privacy and infringement of an individual's freedom from government interference with the liberty of the mind that implicates substantive due process. Additionally, Dykes is no longer on probation and therefore is not subject to the limited liberty interest courts recognize for those serving probationary terms. *See Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (noting that offenders on probation "do not enjoy 'the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions.'" (alteration in original) (quoting *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).

It is true that convicted felons do not have the same constitutional liberties as those who have not been convicted of a felony. *See State v. Bowditch,* 364 N.C. 335, 700 S.E.2d 1, 12 (2010); *cf. Wesley v. Collins,* 791 F.2d 1255, 1261 (6th Cir.1986) ("It is undisputed that a state may constitutionally disenfranchise convicted felons, and that the right of felons to vote is not fundamental."). The State accordingly argues, and the concurrence agrees, that Dykes does not enjoy the full liberty interest described above because she is a convicted sex offender.

However, this misses the nature of the right in question. The precise right Dykes claims is fundamental is the right of a convicted sex offender who is not under any probationary or similar restrictions and *who poses a low risk of reoffending* to be free from continuous satellite monitoring. In our opinion,

if Dykes poses a low risk of reoffending, then her status as a convicted sex offender is no longer a compelling reason to impair her constitutional rights in this regard. As we discuss below, a sex offender's likelihood of reoffending is the impetus for imposing satellite monitoring; as the risk of reoffending diminishes, so too does the rationale for monitoring her. Therefore, while Dykes' status as a convicted felon may impair her rights to some degree, we do not believe the fact that she stands convicted of a sex crime, by itself, is sufficient to warrant lifetime continuous government tracking of her location. If Dykes does pose a low risk of reoffending, it accordingly is clear to us beyond a reasonable doubt that section 23–3–540(C) would infringe on her fundamental rights. *See State v. Stines*, 200 N.C.App. 193, 683 S.E.2d 411, 413 (2009) (finding satellite monitoring implicates a liberty interest).

We are also deeply troubled by the policy restricting the interstate travel of the subject being monitored. "The right to travel is inherent in the concept of our country as a federal union; hence the right to travel is a fundamental constitutional right under the federal constitution." *Mitchell v. Steffen,* 504 N.W.2d 198, 200 (Minn.1993); *see also Pelland v. Rhode Island,* 317 F.Supp.2d 86, 90 (D.R.I.2004) ("American citizens enjoy the constitutionally protected liberty to travel across state borders."). Where an individual is still under a probationary or similar term, a state may constitutionally restrict his right to travel. *See Pelland,* 317 F.Supp.2d at 91; *see also United States v. Crandon,* 173 F.3d 122, 128 (3d Cir.1999) (recognizing conditions of release may curtail certain fundamental rights). However, it is a different situation when a person is not on probation. Requirements that a sex offender notify officials when he leaves the state have been upheld as not sufficiently burdening interstate travel. *See, e.g., United States v. Shenandoah,* 595 F.3d 151, 162–63 (3d Cir.2010); *State v. Wigglesworth,* 186 Or.App. 374, 63 P.3d 1185, 1190 (2003). Far from being a mere notification requirement, the policy here is a flat prohibition against crossing state lines absent government approval. We can see few clearer burdens on interstate travel than having to seek prior permission from the State to leave South Carolina and permitting overnight stays only in emergency situations and with approval solely by the regional director.

Next, we must determine whether section 23–3–540(C) is narrowly tailored to serve a compelling state interest, thus surviving strict scrutiny.[8]   One cannot "minimize the importance and fundamental nature of [an individual's liberty interest].   But, as our cases hold, this right may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society." *United States v. Salerno,* 481 U.S. 739, 750–51, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).   For as Blackstone so eloquently wrote, "[T]his species of legal obedience and conformity is infinitely more desirable[ ] than that wild and savage liberty which is sacrificed to obtain it."   1 William Blackstone, Commentaries *121. Dykes concedes that protecting the public from sex offenders who pose a high risk of reoffending is a compelling state interest; she steadfastly maintains, however, that protecting the public from those who have a low risk of reoffending is not a compelling state interest.   We agree.

It is beyond question that "[s]ex offenders are a serious threat in this Nation." *McKune v. Lile,* 536 U.S. 24, 32, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002).   In fact, "the victims of sexual assault are often juveniles," and "[w]hen convicted sex

8.   We note Dykes posits her argument of unconstitutionality solely in terms of strict scrutiny.   With great respect for the concurrence, we do not believe Dykes' repeated statements that the statute is arbitrary and capricious are sufficient to invoke the rational basis test.   Rational basis review and strict scrutiny are merely the vehicles through which we determine whether a statute is arbitrary for due process purposes, and using the term "arbitrary" or "capricious" is not determinative of the level of review we apply.   However, if we were to apply rational basis review, we would be inclined to find the statute constitutional.   Absent the implication of a fundamental right, "[t]he impairment of a lesser interest ... demands no more than a 'reasonable fit' between governmental purpose ... and the means chosen to advance that purpose." *See Reno,* 507 U.S. at 305, 113 S.Ct. 1439.   A law also "need not be in every respect logically consistent with its aims to be constitutional.   It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Okla.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The State undoubtedly has an important interest in investigating sexual assaults against children, and Dykes has not challenge this interest.   Furthermore, we believe requiring those who have committed similar crimes in the past to be monitored is at least rationally related to that interest and not wholly arbitrary, especially if their right to be free from monitoring is not fundamental.

offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *Id.* at 33, 122 S.Ct. 2017. Thus, the General Assembly noted "[s]tatistics show that sex offenders often pose a high risk of re-offending," S.C.Code Ann. § 23–3–400 (2007), prompting it to enact provisions "to protect the public from those sex offenders who may re-offend," *State v. Walls*, 348 S.C. 26, 31, 558 S.E.2d 524, 526 (2002). However, imposing measures which are justified, at least substantially in part, by the possibility that an individual may reoffend without any actual consideration of his likelihood to reoffend is incongruous and arbitrary. Monitoring sex offenders who pose a low risk of reoffending for the rest of their lives is not "sufficiently weighty" such that the subject's liberty interest in being free from government monitoring must be "subordinated to the greater needs of society." *See Salerno*, 481 U.S. at 750–51, 107 S.Ct. 2095. The same is true with respect to the State's travel policy for it unquestionably infringes on Dykes' fundamental right to travel without any consideration of whether such a restriction is warranted.

We therefore hold that requiring Dykes, a convicted sex offender who is under no probationary or similar restrictions, to submit to satellite monitoring for the rest of her life *if she poses a low risk of reoffending* violates her substantive due process rights. To paraphrase Blackstone, section 23–3–540(C)'s application to Dykes has the potential to decrease her natural liberty without any attendant increase in overall civil liberty. However, because the circuit court made no findings as to Dykes' chance of reoffending, a remand is in order for that determination.

We emphasize that our holding today is a narrow one and the satellite monitoring provisions remain largely intact.[9]

---

9. Consistent with the severability clause found in 2006 Act No. 346–the act passing section 23–3–540–the only portions of the statute affected by our decision are that the court "must" order satellite monitoring for those convicted of CSC–First and lewd act and that these persons have no means of petitioning for relief from the monitoring. *See* 2006 Act No. 346 § 8 (stating that if a court were to find any portion of the statute unconstitutional, that holding does not affect the rest of the statute and the General Assembly would have passed it without that ineffective part); *see also Dean v. Timmerman*, 234 S.C. 35, 43, 106 S.E.2d 665, 669 (1959) ("When the residue of an Act, sans that portion

First, we do not suggest that satellite monitoring as a whole is unconstitutional. Rather, it is only the mandatory monitoring of those who pose a low risk of reoffending that violates due process. Furthermore, our holding only extends to those who are not under any term of probation, parole, or similar restrictions; we express no opinion as to whether mandatory monitoring those who are on probation, parole, or community supervision implicates substantive due process. Our holding also only applies to those who have no mechanism to have the monitoring removed because they have a conviction of CSC–First or lewd act. Given the manner in which Dykes framed this issue to us and the strictures of *Glucksberg,* we also do not reach today the issue of whether those individuals who are found to pose a high risk of reoffending have a due process right to discretionary imposition or periodic review of their lifetime monitoring.

Accordingly, the circuit court on remand will exercise discretion to determine Dykes' risk of reoffending. If it finds she has a low risk of re-offending but nevertheless imposes monitoring, Dykes will be able to petition for release from the monitoring after ten years, consistent with section 23–3–540(H).

## CONCLUSION

For the foregoing reasons, we reverse the order of the circuit court and remand for proceedings consistent with this opinion.[10]

BEATTY, J., concurs.

KITTREDGE, J., concurring in a separate opinion in which TOAL, C.J. and PLEICONES, J., concur.

---

found to be unconstitutional, is capable of being executed in accordance with the Legislative intent, independent of the rejected portion, the Act as a whole should not be stricken as being in violation of a Constitutional Provision.").

**10.** Because our conclusion here is dispositive of Dykes' appeal, we do not reach her remaining challenges to section 23–3–540(C). *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating that a court need not reach remaining issues if one issue is dispositive of the appeal).

Justice KITTREDGE.

I concur in result. I commend my learned colleague for her scholarly research, and I agree with the majority's general proposition that persons have a fundamental right "to be let alone." But I respectfully disagree that Appellant, as a convicted child sex offender, possesses a right that is fundamental in the constitutional sense. I do not view Appellant's purported right as fundamental. I would find Appellant possesses a liberty interest entitled to constitutional protection, for all persons most assuredly have a liberty interest to be free from *unreasonable* governmental interference. I would find that the challenged mandatory lifetime, non-reviewable satellite monitoring provision in section 23–3–540(C) is arbitrary and fails the minimal rational relationship test.[11]

## I.

■ I begin with the premise that satellite monitoring is predominantly civil. *See Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (noting that whether a statute is criminal or civil primarily is a question of statutory construction). Where, as here, the legislature deems a statutory scheme civil, "only the clearest proof" will transform a civil regulatory scheme into that which imposes a criminal penalty.

---

11. Following the rape and murder of a nine year-old-girl by a convicted sex offender who lived across the street, Florida passed the Jessica Langford Act in 2005. This Act, referred to as "Jessica's Law," heightened criminal sentences and post-release monitoring of child sex offenders. Many states, including South Carolina, followed suit in adopting some version of Jessica's Law. However, South Carolina's requirement of mandatory lifetime monitoring without review is more severe than the statutory scheme of other jurisdictions. A common approach among other states that have adopted some form of "Jessica's Law" is to require either a predicate finding of probability to reoffend or provide a judicial review process, which allows for, upon a proper showing, a court order releasing the offender from the satellite monitoring requirements. *See generally,* N.C. Gen.Stat. Ann. § 14–208.43 (West 2010) (providing a termination procedure one year after the imposition of the satellite based monitoring or a risk assessment for certain offenders). In accordance with the severability clause in South Carolina's statutory scheme, I concur with the finding of the majority expressed in footnote 7 that the offenses of criminal sexual conduct in the first degree and committing or attempting a lewd act upon a child under sixteen must follow the process as outlined for the balance of child sex related offenses.

*Id.* at 92, 123 S.Ct. 1140 (quoting *Hudson v. United States,* 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997)) (internal quotations omitted).

The General Assembly expressly stated its intent:

The intent of this article is to promote the state's fundamental right to provide for the public health, welfare, and safety of its citizens [by] . . . provid[ing] law enforcement with the tools needed in investigating criminal offenses. Statistics show that sex offenders often pose a high risk of reoffending. Additionally, law enforcement's efforts to protect communities, conduct investigations, and apprehend offenders who commit sex offenses are impaired by the lack of information about these convicted offenders who live within the law enforcement agency's jurisdiction.

S.C.Code Ann. § 23-3-400 (2007). This Court has examined this language and held "it is clear the General Assembly did not intend to punish sex offenders, but instead intended to protect the public from those sex offenders who may re-offend and to aid law enforcement in solving sex crimes." *State v. Walls,* 348 S.C. 26, 31, 558 S.E.2d 524, 526 (2002). Thus, a likelihood of re-offending lies at the core of South Carolina's statutory scheme.

## II.

■ The United States Supreme Court has cautioned restraint in the recognition of rights deemed to be fundamental in a constitutional sense. *Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Courts must "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [members of the judiciary]." *Id.* at 720, 117 S.Ct. 2258. The Due Process Clause protects only "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Id.* at 720-21, 117 S.Ct. 2258 (internal citations omitted). I would not hold that a convicted child sex offender has a fundamental right to be "let alone" that is "deeply rooted in this Nation's history and tradition." Given the civil nature of satellite monitoring and the clear authority of the legislature to impose such a

regulatory scheme, I respectfully reject the suggestion that a convicted child sex offender's limited liberty interest morphs into a fundamental right when the active sentence comes to an end.

Notwithstanding the absence of a fundamental right, I do believe lifetime imposition of satellite monitoring, with no consideration of likelihood of re-offending, implicates a liberty interest and invokes minimum due process protection.[12] *See Commonwealth v. Cory*, 454 Mass. 559, 911 N.E.2d 187 (2009) (finding satellite monitoring burdens an offender's liberty interest in two ways, by "its permanent, physical attachment to the offender, and by its continuous surveillance of the offender's activities"). Thus, courts must "ensure[ ] that legislation which deprives a person of a life, liberty, or property right have, at a minimum, a rational basis, and not be arbitrary...." *In re Treatment and Care of Luckabaugh*, 351 S.C. 122, 139–40, 568 S.E.2d 338, 346 (2002); *see also Nebbia v. N.Y.*, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934) ("[T]he guarant[ee] of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious...."); *Hamilton v. Bd. of Trs. of Oconee County Sch. Dist.*, 282 S.C. 519, 319 S.E.2d 717 (Ct.App.1984) (holding that, to comport with due process, the legislation must have a rational basis for the deprivation and may not be

---

12. In my opinion, although Appellant posited her main argument in terms of strict scrutiny, Appellant's presentation of a due process challenge sufficiently permits the Court to consider such claim under the lesser levels of scrutiny. Indeed, Appellant's final brief contains many assertions that fit the rational relationship test, for example:

Substantive due process protects citizens against arbitrary or capricious action by the government regardless of the procedures used to carry out that action.... In this case, appellant's substantive due process rights were violated because § 23-3-540(C) mandated [the trial judge] arbitrarily and capriciously imposed lifetime GPS monitoring on her. The imposition was arbitrary and capricious.... The substantive component of this right prohibits the state from arbitrarily or capriciously depriving a person of life, liberty, or property regardless of whether or not the way in which the government carries out this deprivation is, itself, ostensibly fair.

The concept of "arbitrary and capricious" lies at the heart of the rational relationship test. Therefore, I would find that the Court may properly consider Appellant's due process challenge under the rational relationship test.

"so inadequate that the judiciary will characterize it as arbitrary").

■ Having served her sentence, I believe Appellant possesses a liberty interest that is violated by the mandatory, non-reviewable provisions of section 23-3-540(C). Applying the rational basis test to Appellant's due process challenge, I would find the mandated lifetime satellite monitoring and absence of any judicial review related to an assessment of an individual's likelihood of re-offending renders the challenged provision arbitrary. Further, in light of the legislature's predication of the statutory scheme on the substantial purpose of protecting the public from sex offenders who may re-offend, I would find the lack of risk assessment within section 23-3-540(C) not rationally related to such purpose, and thus unconstitutional. *See Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (finding an individual's liberty interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by clear and convincing proof); *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (upholding sexually violent predator commitment statute and emphasizing the role of the review to ensure commitment lasts only so long as it is necessary to protect the public); *see also Lyng v. Int'l Union*, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) (noting that although allegedly arbitrary legislation invokes the least intrusive rational basis test, that standard of review is "not a toothless one"); *Luckabaugh*, 351 S.C. at 139-40, 568 S.E.2d at 346 (finding due process ensures that a statute which deprives a person of a liberty interest has "at a minimum, a rational basis, and may not be arbitrary").

I believe the finding of arbitrariness is additionally supported by the South Carolina Constitution, which, unlike the United States Constitution, has an express privacy provision. *See* S.C. Const. art. I, § 10 ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated. . . ."). While our constitution's privacy provision does not transform a purported privacy interest into a fundamental right for purposes of applying the strict scrutiny test, I believe it does inform the analysis of whether a state law is arbitrary and lends addition-

al support to the conclusion that section 23–3–540(C) is unconstitutional. *Cf. State v. Weaver*, 374 S.C. 313, 649 S.E.2d 479 (2007) (holding that by articulating a specific prohibition against unreasonable invasions of privacy, the people of South Carolina have indicated a higher level of privacy protection than the federal Constitution).

Therefore, I concur in result to reverse and remand.

TOAL, C.J., and PLEICONES, J., concur.